Filed 5/7/21; certified for publication 6/1/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| APPLIED MATERIALS et al.,<br><br>    Petitioners,<br><br>    v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and D.C.,<br><br>    Respondents. | H047148<br>(W.C.A.B. No. ADJ1351389) |
| XL SPECIALTY INSURANCE CO.,<br><br>    Petitioner,<br><br>    v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and D.C.,<br><br>    Respondents. | H047154<br>(W.C.A.B. Nos. ADJ7168611,<br>                         ADJ7183596) |

## I. INTRODUCTION

Respondent injured worker, D.C. (Worker),[1] was employed by petitioner Applied Materials from 1996 until 2008. During that time, she claimed three industrial injuries:

---

[1] Since this case involves allegations of sexual abuse, we refer to the injured worker by her initials or the status designation "Worker" to protect her privacy. (See e.g. *Baker v. Workers' Comp. Appeals Bd*. (2011) 52 Cal.4th 434, 439, fn. 3 [court used initials for a fictitious name to protect injured worker's medical privacy]; *Western*
(continued)

a specific injury to her neck and right upper extremity in 2001, a specific injury to her neck and both upper extremities in 2005, and a cumulative trauma injury to her neck, both upper extremities, and psyche ending on her last day worked in January 2008. Worker claimed her injuries were due to the constant, repeated use of a computer keyboard and mouse at work. After the first injury in 2001, Worker returned to work on modified duty and continued to perform modified work—punctuated by periods of total temporary disability—until 2008. In 2006, Worker developed injuries to her psyche (a pain disorder due to her chronic pain, an anxiety disorder, and depression), which she claimed were industrial because they were compensable consequences of her physical injuries. Worker later claimed that in 2013, she was sexually exploited by Dr. John Massey, the physician primarily responsible for the treatment of her industrial injuries. She claimed that he touched her inappropriately on multiple occasions at his clinic and had sexual intercourse with her five times in her home. As a result of the doctor's alleged misconduct, Worker claimed that she suffered a further injury to her psyche and was diagnosed with posttraumatic stress disorder (PTSD). Worker claimed her PTSD was industrial as a compensable consequence of the medical treatment her employer provided for all three of her industrial injuries.

Arrowood Indemnity Company (Arrowood)—the workers' compensation carrier for the 2001 specific injury claim—accepted liability for Worker's 2001 physical injury claims, but disputed liability for her psychiatric injuries, including PTSD, on a variety of grounds. XL Specialty Insurance Company, as administered by Corvel Corporation (hereafter XL Specialty)—the workers' compensation carrier for both the 2005 specific injury and the 2008 cumulative trauma injury claims—denied liability for Worker's physical and psychiatric injuries, arguing among other things that Worker's injuries were

_Airlines v. Workers' Comp. Appeals Bd._ (1984) 155 Cal.App.3d 366, 368 [appellate court referred to flight attendant who was raped as "claimant" and did not state her name].)

all due to the 2001 injury. Both insurers contended that Worker's psychiatric injury (PTSD) resulting from her claimed sexual exploitation by Dr. Massey was not industrial because it was the result of a consensual sexual relationship and occurred at her home.

The case went to trial before a workers' compensation judge (WCJ) in 2017. The WCJ found that all of Worker's injury claims—including her depression, anxiety, and PTSD—were industrial; ordered XL Specialty to pay two years' back temporary disability (TD); awarded Worker 100 percent permanent disability (sometimes PD) based on her PTSD alone retroactive to October 2010; found no apportionment; and concluded that the insurers were jointly and severally liable for the PD award since Dr. Massey treated all three of her industrial injuries. All parties (Applied Materials, Arrowood, XL Specialty, and Worker) petitioned the Workers' Compensation Appeals Board (WCAB) for reconsideration. The WCAB granted reconsideration. In its June 2019 decision, the WCAB amended the amount of the weekly TD and PD rates as recommended by the WCJ, made an order regarding attorney fees that is not at issue here, and otherwise affirmed the WCJ's findings and award.

Arrowood and XL Specialty filed separate petitions for review of the WCAB's decision.[2] We granted review in both cases and ordered the two petitions considered together for further briefing, oral argument, and disposition.

## II. CONTENTIONS AND CONCLUSIONS ON WRIT REVIEW

(1) XL Specialty contends that the correct date of injury for the cumulative trauma claim was in March 2002 (during Arrowood's coverage) and that the WCAB erred in finding a cumulative trauma injury in 2008 (during XL Specialty's coverage).

---

[2] Arrowood's petition also names the employer, Applied Materials, as a petitioner. XL Specialty's petition identifies the petitioner as "XL Specialty Insurance Company as administered by Corvel," but does not name the employer as a petitioner. For ease of reference, we shall refer to petitioners Applied Materials and Arrowood jointly as "Arrowood" and all petitioners jointly as "Petitioners."

3

Reviewing the entire record, we conclude there was substantial evidence of repeated exposure to injury causing events and new injuries after 2005 that supported the WCAB's finding of cumulative trauma ending in 2008. We therefore reject XL Specialty's contention that the correct date of injury for the cumulative trauma was in 2002.

(2) Both petitioners challenge the WCAB's finding of industrial causation, arguing that the sexual activity between Worker and Dr. Massey was not medical treatment, was consensual, and broke the chain of industrial causation. We conclude that Worker met her burden of proving that her PTSD was a compensable consequence injury that resulted from the treatment for her industrial injuries and that her employment was one of the contributing causes without which her PTSD would not have occurred. We reject the contention that the sexual conduct here was consensual, since as a matter of law a patient cannot consent to sexual contact with his or her physician. (Bus. & Prof. Code, § 729, subd. (b).) We also reject Petitioners' contention that Worker's PTSD is not compensable under the rules governing industrial injuries arising out of assaults by third parties.

(3) We reject XL Specialty's contention that it is not liable for Worker's psychiatric disability since it did not authorize or pay for any of the treatment with Dr. Massey or his clinic. Substantial evidence supports the WCAB's conclusion that Dr. Massey treated Worker for all three injuries, including the injuries she sustained during XL Specialty's coverage period.

(4) We reject XL Specialty's challenges to the sufficiency of Dr. Steven Feinberg's agreed medical examiner (AME) reports to support the WCAB's finding of orthopedic injuries during XL Specialty's coverage period. Contrary to XL Specialty's assertions, the AME's evaluation included an extensive review of Worker's medical records and it was not necessary for the AME to reexamine Worker after 2011 to opine regarding industrial causation since her injuries predated 2008.

4

(5) We reject Arrowood's challenges to the sufficiency of the evidence to support the WCAB's findings of psychiatric injury due to the 2001 injury. We conclude that substantial evidence supported the WCAB's finding that Worker's PTSD was due in part to her 2001 injury since Dr. Massey treated Worker for all three injuries and Arrowood authorized and paid for the treatment.

(6) We reject Arrowood's challenge to the sufficiency of the evidence to support a finding of new and further disability within five years of the November 2001 injury. We conclude that there was substantial evidence of a new need for medical treatment, including psychiatric treatment, before November 2006 that supported the WCAB's implied finding of new and further disability from the November 2001 injury.

(7) We reject Arrowood's challenge to the sufficiency of the medical reports from Dr. Allan Sidle (the psychiatric qualified medical examiner (QME)) to support the PD award, which challenge is based on Arrowood's contention that the QME relied on the wrong PD rating schedule. Arrowood asserts that the 1997 Schedule for Rating Permanent Disabilities (1997 Schedule)[3] applies to the 2001 injury, that the QME described Worker's PD in accordance with the 2005 Schedule for Rating Permanent Disabilities (2005 Schedule)[4], and that he failed to describe Worker's disability in accordance with the 1997 Schedule. We will hold that in the circumstances in this case, the 2005 Schedule applies to the psychiatric PD claim.

(8) We conclude that the 100 percent PD award must be annulled because Dr. Sidle's reports that the WCAB relied on do not constitute substantial evidence since Dr. Sidle relied on an incorrect legal theory, the alternative path theory, that was subsequently rejected in *Department of Corrections & Rehabilitation v. Workers' Comp.*

---

[3] California Department of Industrial Relations, Division of Workers' Compensation, Schedule for Rating Permanent Disabilities (April 1997).

[4] California Department of Industrial Relations, Division of Workers' Compensation, Schedule for Rating Permanent Disabilities (Jan. 2005).

*Appeals Bd.* (2018) 27 Cal.App.5th 607 (*Fitzpatrick*).  We also conclude that Worker's evidence was otherwise insufficient to rebut the scheduled rating for her psychiatric disability, which was 68 or 70 percent.

(9) Arrowood challenges the WCAB's finding of no apportionment on three grounds.  It contends that Dr. Sidle's opinions are not substantial evidence because he (1) failed to apportion between the three industrial injuries and opined that the three injuries were inextricably intertwined; (2) failed to apportion to nonindustrial factors; and (3) failed to apportion to the pain disorder and depression that predated her PTSD diagnosis.  Since we annul the PD award and remand for further proceedings, we do not address Arrowood's contentions, but we do review the rules governing apportionment for the guidance of the WCAB and parties on remand.

(10) Finally, we reject Arrowood's contentions that the WCAB ordered total PD benefits at the wrong weekly rate for the 2001 injury and that the WCAB erred in ordering it to administer the joint and several PD award.  Since Arrowood failed to raise these issues in its petition for reconsideration to the WCAB, these points have been waived and are not cognizable in these proceedings.

In view of our conclusions, we will annul the award and remand to the WCAB for further proceedings consistent with our opinion.

### III.  FACTUAL AND PROCEDURAL HISTORY

#### A.  *History of Industrial Injuries*, *Medical Treatment*, *and Workers' Compensation Claims*

Worker began working for Applied Materials in 1996 as an administrative assistant and was eventually promoted to program manager for marketing, communications, and international training programs.  The history of her industrial injuries is complex, with three dates of injury, injuries to multiple body parts, numerous

6

diagnoses, compensable consequence injuries, "massive" amounts of treatment over 16 years (2001 to 2017), and at least 26 medical-legal evaluations.

In November 2001, Worker developed pain in her neck and her right elbow, wrist, and shoulder, with numbness and tingling in the right hand and fingers, which she attributed to the constant, repeated use of a computer keyboard and mouse at work. Her diagnoses included tendonitis, mild carpal tunnel syndrome, epicondylitis, cervical myofascial pain, and mild degenerative changes in her neck. For the first few years, she was treated primarily by Dr. Sunita Jayakar. Worker received conservative treatment, including cortisone injections in the elbow and neck, physical therapy, chiropractic adjustments, medication, biofeedback, acupuncture, splints, and trigger point injections. Dr. Jayakar also placed her on modified duties, with her work hours reduced to half-days for six months. Her work restrictions included limiting her use of a computer keyboard and mouse. Worker returned to work full time on October 1, 2002. She had flare-ups in 2003 and 2004 and was restricted to working half days for three months in early 2004. Dr. Jayakar declared her condition permanent and stationary in November 2002 and again in April 2004.

Arrowood was the workers' compensation insurer for the 2001 injury. In June 2005, Worker—who was then self-represented—and Arrowood entered into stipulations with request for an award based on Dr. Jayakar's reports. They stipulated that Worker had sustained a specific industrial injury on November 27, 2001, to her neck and *right* arm that resulted in 33 percent PD and that she was entitled to future medical care. A WCJ approved the stipulated award.

In May 2005, Worker began to complain of pain in her *left* wrist, elbow, and shoulder, radiating to her neck and upper back, which resulted in part from overuse of her left arm due to the injury to her right arm. She reported this injury to her employer and filed a new claim for workers' compensation benefits. From 2005 until 2008, Applied

7

Materials was insured for workers' compensation by XL Specialty.[5]  Worker's diagnoses in 2005 and 2006 included left wrist, biceps, and elbow tendonitis; lateral epicondylitis; upper extremity overuse/repetitive strain injury; carpal tunnel syndrome; trapezius strain; cervical strain with asymptomatic degenerative changes in her neck; cervical myofascial pain; and chronic pain syndrome.  XL Specialty denied liability for the 2005 injury.

In February 2006, Worker saw Dr. Ronald Fujimoto, a pain specialist at RehabOne, a rehabilitation and pain clinic, regarding a possible transfer of care.  He noted that she was still working and reported that he had nothing to offer her.  A month later, Dr. Fujimoto requested authorization to refer her to a psychologist for pain management and biofeedback.  Worker returned to Dr. Jayakar, who later referred her to the Bay Area Pain and Wellness Clinic (BAPWC).  In April 2006, Worker complained to a consulting orthopedist that she was depressed secondary to her industrial injuries.

In July 2006, Worker consulted with Dr. Steven Feinberg (an orthopedist at BAPWC) and Dr. Greg Garavanian (a BAPWC psychologist) to determine whether she might benefit from BAPWC's multi-disciplinary approach.  Dr. Feinberg recommended she complete BAPWC's 200-hour functional restoration program, which included daily classes, physical therapy, and psychological counseling.  Dr. Garavanian diagnosed a chronic pain disorder and a sleep disorder due to chronic pain.  He also recommended Worker complete the functional restoration program.  In August 2006, Worker transferred her treatment to Dr. Alpana Gowda, a pain specialist at BAPWC.  In addition to the physical injuries, Dr. Gowda diagnosed Worker with depression.  Worker was off work again for 11 months from June 2006 until May 2007.

---

[5]  It is not clear from the record precisely when XL Specialty provided coverage (i.e., when its policies incepted and when they ended), but it is undisputed that XL Specialty insured Applied Materials for workers' compensation liability from May 2005 through January 2008.

In October 2006, Worker filed a petition to reopen her workers' compensation case for her 2001 injury due to new and further disability. (At trial, the parties stipulated that the petition to reopen was timely filed.)

In late October 2006, Worker started the functional restoration program at BAPWC, but left after four days because of anxiety. Worker continued to treat with Dr. Gowda, who recommended psychotherapy and referred her to BAPWC's psychiatrist, Dr. Gordon Walker, to treat her anxiety and depression. Dr. Walker diagnosed Worker with major depression, a generalized anxiety disorder, and chronic pain disorder due to her industrial injuries. In February 2007, Dr. Gowda reported that Worker's depression and anxiety were "overwhelming."

Later in 2007, Dr. John Massey (an anesthesiologist/pain specialist) replaced Dr. Gowda as Worker's primary treating physician at BAPWC. Worker received medical treatment from BAPWC for more than seven years: from August 2006 until December 2013. During that time, Dr. Massey managed her overall treatment, treated her physical injuries, and prescribed medication for both her physical and psychiatric injuries. A psychiatrist (Dr. Walker and later Dr. James Weiss) prescribed medication for her psychiatric injuries, and multiple psychologists provided psychotherapy, including cognitive behavioral therapy and pain counseling. Worker's treatment at BAPWC included medication, physical therapy, acupuncture, trigger point injections, a TENS (transcutaneous electrical nerve stimulation) unit, and cervical epidural injections. Her medications included pain killers, opioids, anti-depressants, anti-neuropathic drugs, anti-inflammatory drugs, and anti-anxiety drugs.

In May 2007, Worker returned to work part-time on modified duty; by October 2007, she was back to work full time on modified duty. Applied Materials laid Worker off in January 2008, after her position was eliminated. She was 44 years old at that time. She subsequently claimed a cumulative trauma injury to her neck, upper extremities, and

9

psyche through January 15, 2008 (her last day worked).  XL Specialty denied that claim, too.

In early 2008, Worker completed the eight-week functional restoration program at BAPWC.  In May 2008, Dr. Mark Bernhard examined her as a QME in orthopedics.  He opined that her symptoms were complex with some magnification and somatization in excess of what would be expected from her objective findings.  He concluded that her orthopedic condition was permanent and stationary, described her factors of disability, and apportioned 10 percent of her PD to preexisting, nonindustrial degenerative changes and apportioned the remaining 90 percent of her PD equally between her 2001 and 2005 injuries.

In September 2008, Worker enrolled in graduate school at Golden Gate University, where she obtained a master's degree in human resources management in 2009.

In 2009, Dr. Massey concluded that Worker was permanent and stationary from an orthopedic standpoint, but still needed psychiatric treatment.  He also opined that the "combination of her orthopedic issues and her psychiatric comorbidity make her unemployable in the open labor market" and that she could never "reliably return to work."  In December 2009, Worker had low back surgery on a nonindustrial basis.  In 2010, she fell at home and tore a ligament in her left foot, which required surgery.  Worker later claimed that her low back and left foot injuries were industrial.  The medical-legal evaluators disagreed as to whether those injuries were industrial, and the WCJ found that they were not.  (That finding is not at issue here.)

In May 2010, Worker's counsel obtained a medical-legal report from Dr. Massey.  He reported that her condition was permanent and stationary from an orthopedic standpoint, but that he was not qualified to opine regarding her psychiatric condition or disability.  He nonetheless opined that the combination of her "orthopedic and

10

psychologic impairment leaves her unable to compete in the open labor market" and that the disabilities to her low back and leg, when combined with her neck and upper extremity conditions, result in 100 percent PD.

In January 2011, Worker and Arrowood entered into a "Stipulation and Award and/or Order." They stipulated that Arrowood would continue to provide medical care pursuant to the open award in the 2001 case with Dr. Massey as the treating physician; that Arrowood would authorize "[a]ll reasonable care requests by Dr. Massey," and that Dr. Feinberg—who was no longer with BAPWC—would serve as an AME as to all medical and medical-legal issues, including the petition to reopen. A WCJ approved that stipulation and order.

When Worker saw Dr. Feinberg for the agreed medical examination in May 2011, she complained of constant neck pain that radiated to both shoulders, down her arms and into both elbows; prickly, stabbing pains and weakness in both elbows; pain in her hands, wrists, and right thumb, with pins and needles sensations in three fingers on her left hand; pain in her low back, left leg, and foot; and difficulty sleeping. "Every task flare[d] up her pain." She appeared "very depressed" and "hopeless" and was taking 14 medications. Dr. Feinberg opined that her condition was not permanent and stationary, that her upper body symptoms were partially related to her 2001 injury and partially due to cumulative trauma through January 15, 2008; that she remained temporarily disabled and needed further diagnostic studies for her neck; that her prognosis for future employment was grim; that she was significantly depressed and overmedicated and needed to be "detoxified."

Dr. Jeffrey Holmes was the orthopedic QME for the 2008 cumulative trauma claim. He examined Worker on April 28, 2011, and declared her orthopedic condition permanent and stationary as of that date. Dr. Holmes opined that the injuries to her neck and upper extremities were due to "a prolonged cumulative trauma" that began in 2001

11

and continued through the end of her employment in 2008 and that "[t]he entire period is responsible for" the disability in her cervical spine and arms.

Dr. Sidle was the psychiatric QME for XL Specialty's 2008 cumulative trauma claim. He reported that Worker appeared "significantly overmedicated," "was not fully oriented," and exhibited problems with memory and concentration when he examined her in April 2011. He diagnosed a pain disorder due to the interaction of her underlying psychological issues and her musculoskeletal injuries, an anxiety disorder (panic disorder with agoraphobia), and a major depressive disorder. He opined that the predominant cause of her psychiatric complaints was the cumulative trauma ending on January 15, 2008, and that her psychiatric injuries were a compensable consequence of her physical injuries. He stated that her condition was not yet permanent and stationary, that she was temporarily disabled due to her psychiatric injuries, and that she would not stabilize until Dr. Weiss found an effective medication regimen for her. Dr. Sidle reported that when her condition stabilizes, he would consider apportionment to nonindustrial factors (her abusive childhood, alcoholic parents, the failure of her relationship with her daughter's father).

In 2012, Arrowood implemented a Medical Provider Network (MPN)—a network of health care providers approved by the Department of Industrial Relations to treat injured workers (Lab. Code,[6] § 4616, subd. (a)(1))—and notified Worker of her right to select a physician within the MPN. According to Arrowood's petition, Dr. Massey was in its MPN and Arrowood told Worker she could continue seeing him.

Dr. Sidle saw Worker again in January 2013. She said she had been severely depressed and suicidal for months and thought she would benefit from inpatient psychiatric care. She was receiving social security disability and long-term disability benefits, which were being authorized by Dr. Massey. Dr. Sidle reported that her

---

[6] All undesignated statutory references are to the Labor Code.

12

depression had become more severe than before. He opined that Worker's anxiety, depression, and pain disorder were compensable consequences of her physical injuries from the 2008 cumulative trauma claim; that she was no longer overmedicated; and that she was temporarily disabled by her psychiatric injury and "urgently needed" inpatient treatment. He recommended an inpatient program because Worker was in a very vulnerable state and at a high risk for suicide. This was about the time Dr. Massey started making inappropriate comments of a sexual nature to Worker. (Worker never received the inpatient treatment.)

## B. Sexual Exploitation by Dr. Massey[7]

On five occasions between May 22 and June 25, 2013, Dr. Massey went to Worker's home during the day. Each time, she let him in; they talked and then he led her to her bedroom, where they had sexual intercourse. The first time, she told him she did not date married men, did not want to have sex with him, and thought it was "weird" because he was her doctor. But she did not resist his advances either. She froze. She did not know how to deal with the situation and did not feel empowered to tell him to leave. He was her doctor and she thought he had her best interest in mind.

Starting in 2012—long before Dr. Massey began coming to her home—he hugged her in suggestive ways and engaged in sexual banter with her in exam rooms at BAPWC as a way of grooming her for what happened later. Several times, he asked her if she was in a relationship, told her she was "hot," said she " 'should be getting laid,' " and commented on the size of her breasts. Dr. Massey made a comment about her breasts in front of other staff while administering a steroid injection. A few days before their first

---

[7] This section of the statement of facts is based on Worker's testimony both in deposition and at the trial before the WCJ. The deposition transcripts were placed in evidence at trial and the parties asked the WCJ to consider the deposition testimony we rely on.

13

sexual encounter, while examining her at BAPWC, he asked her about her sex life again and said, " '[W]ell, you know I would do you.' "

On many occasions *after* they started having sex, Dr. Massey made sexual comments, touched her in a sexual way, kissed her, groped her, or had her touch his erect penis in exam rooms at BAPWC. On July 31, 2013, Worker had a panic attack in front of other patients in the gym at BAPWC after Dr. Massey tried to get her into an exam room.

Dr. Massey continued to go to Worker's home after their fifth sexual encounter. He went there six times between July 14 and October 10, 2013. He asked her for sex, but on those occasions, she refused him. Dr. Massey telephoned Worker more than 70 times between May and November 2013. Worker testified that Dr. Massey controlled her treatment and disability benefits and told her multiple times "that if anyone found out about the affair," he would have to stop being her doctor and would no longer complete her disability forms. She was overmedicated and felt stuck because he was her treating physician. As things progressed, she felt "threatened" by the role he played in her care. Worker testified that she did not enjoy any of their sexual interactions and that it was not something she wanted to do.

In June 2013, Worker told her wellness instructor at BAPWC about the sexual conduct with Dr. Massey, and the instructor reported the matter to BAPWC management. Shortly thereafter, Dr. Massey asked Worker to deny that anything had happened between them; he later told Worker that BAPWC was thinking about suspending him and asked her to lie about their sexual relationship. Worker continued to be treated by BAPWC and Dr. Massey until December 12, 2013.

14

In May 2014, Worker contacted the Medical Board of California (Medical Board). The clinic, the police, and the Medical Board investigated her claims.[8] Worker told Dr. Sidle that the Medical Board and police investigations had been "very stressful" and "a little terrifying." In September 2016, the Medical Board filed a formal accusation against Dr. Massey and charged him with multiple causes of action for discipline. The first cause of action alleged unprofessional conduct, sexual misconduct, gross negligence, repeated acts of negligence, and incompetence in violation of Business and Professions Code sections 726, 2234, and 2236 based on his relationship with and care and treatment of Worker. It asserted that while sexually exploiting her, Dr. Massey prescribed six medications: narcotic and neuropathic pain relievers, a potent opioid, a hypnotic for insomnia, an anti-depressant, and a psychotropic for anxiety. The matter went to a formal hearing before the Medical Board; after the hearing, the Medical Board revoked Dr. Massey's license.[9]

In November 2013, Dr. Paul Michaels did a psychiatric QME evaluation for Arrowood. Worker told him she was quite vulnerable and felt manipulated, seduced, and betrayed by Dr. Massey. Dr. Michaels diagnosed major depression and chronic pain. He opined that there was no evidence of any psychiatric injury from her 2001 industrial injury, that her psychiatric injury was "most likely the result of the cumulative trauma

---

[8] Worker also alleged that in early 2013, a male psychologist who had treated her six times at BAPWC came to her home, made remarks of a sexual nature that made her extremely uncomfortable, gave her an art book with sexually suggestive images, and asked her out. Worker advised BAPWC that she no longer wished to be treated by the psychologist. Although she considered filing a complaint against him with the applicable licensing board, she did not do so.

[9] Arrowood's petition asserts that the Medical Board revoked Dr. Massey's medical license in 2018. There is no evidence of that in the record. On the court's own motion, we shall take judicial notice of the First District Court of Appeal's 2019 order in case No. A157859 denying Dr. Massey's request for writ relief from the Medical Board's order revoking his license and the California Supreme Court's order denying his petition for review of that order in case No. S257281.

15

through 2008." He stated that her condition had not been properly treated with either appropriate medications or psychotherapy and that she had been temporarily disabled on a psychiatric basis since early 2013 due to Dr. Massey's inappropriate conduct, and not her physical injuries.

### C. *Medical and Psychiatric Treatment and Evaluations After December 2013*

In December 2013, Worker transferred her treatment to RehabOne, where she received treatment from Dr. Melinda Brown (physical medicine), Dr. Janet Kraemer (psychologist), and Dr. Ronald Diebel (psychiatrist). Worker testified that Dr. Brown took her off most of her medications and that if she had not been overmedicated, she would have been able to refuse Dr. Massey's advances. In December 2013, Dr. Brown reported that Worker needed psychiatric treatment to monitor and reduce her reliance on medications, a neurosurgical consultation to put the issue of neck surgery to rest, and psychotherapy for pain management. Worker received extensive treatment at RehabOne and was still treating there when the case went to trial in May 2017. Over the years, authorization for much of the treatment Dr. Brown recommended, including medications she prescribed, was denied or delayed in the workers' compensation utilization review process.

In January 2014, Worker returned to Dr. Sidle (XL Specialty's psychiatric QME). She complained of nightmares, a 30-pound weight loss, and difficulty trusting male health care workers. Dr. Sidle agreed that she was still temporarily disabled and "not yet permanent and stationary psychiatrically." He noted that the question whether Worker's injuries that were due to Dr. Massey's inappropriate sexual conduct should be considered industrial and compensable is a legal, not a medical question. He nonetheless opined that they should be considered compensable because Dr. Massey treated her for her "accepted physical injuries." Dr. Sidle stated that if her allegations were true, Dr. Massey's conduct was "clearly not within the bounds of appropriate ethical behavior." He again suggested

16

that when Worker's condition becomes permanent and stationary, apportionment to nonindustrial stressors would be appropriate.

Worker started receiving psychotherapy with Dr. Kraemer, the psychologist at RehabOne, in May 2014. Dr. Kraemer diagnosed severe major depression and severe PTSD with panic attacks. Initially, Dr. Kraemer limited her treatment to Worker's pain disorder because the insurance carriers had denied liability for the PTSD, reasoning that it was due to her sexual relationship with Dr. Massey and not her industrial injuries.

Dr. Sidle reexamined Worker in March 2015. He noted that her psychiatric condition was worsening, due in part to the investigations into her allegations against Dr. Massey, and that her new psychologist had diagnosed PTSD. Dr. Sidle disagreed with that diagnosis. Worker reported being very fearful of running into Dr. Massey or his family, who lived near her home. Dr. Sidle opined that cumulative trauma from 2001 to 2008 was a predominant cause of her psychiatric injury, that her psychiatric conditions were a compensable consequence of her accepted physical injuries, that there was additional exposure due to what happened with Dr. Massey, and that Worker needed additional treatment that should be paid for on an industrial basis.

Dr. Sidle saw Worker again in January 2016. She disclosed more details about her sexual contacts with Dr. Massey and said she still had nightmares about their encounters and no longer felt safe in her own home. Dr. Sidle noted that she appeared more anxious and depressed than previously. Based on the new information, Dr. Sidle revised his diagnosis and agreed that she had PTSD. He said her PTSD encompassed "her anxiety and depression rather than diagnosing each of them separately." He also diagnosed a pain disorder. He stated that her PTSD was "100% industrial" because Dr. Massey "had been assigned by Worker's [*sic*] Comp to treat her Worker's [*sic*] Comp injury" and was filling out her disability forms. Dr. Sidle opined that she was permanent and stationary and assigned a Global Assessment of Function (GAF) score of 45, which he said he

17

understood to mean "that she cannot hold a job" and would be "considered totally disabled." He stated that she needed future medical care (counseling, psychiatric treatment, and medication). He opined that she was 100 percent permanently disabled based on her psychiatric condition alone and was unable to work. The factors that impacted her ability to work included her anxiety and depression, difficulty with sleep, decreased energy, and decreased concentration. He opined that it was not possible for her to meet the demands of an employer on a steady basis eight hours a day, five days a week.

Dr. Kraemer reported in January 2016 that she had seen Worker for 22 psychotherapy sessions. Because the carriers had denied liability for her PTSD, Dr. Kraemer had chosen interventions that would help her depression, anxiety, and PTSD, but stated that her mental state would not improve without treating her PTSD directly. Dr. Kraemer opined that Worker's PTSD was industrial. She stated that Worker was reluctant to tell Dr. Sidle what actually happened with Dr. Massey and as a result gave him "the impression that this was something in the nature of a distressing consentual [*sic*] affair, instead of a series of 5 nonconsensual, sexual violations, each more traumatizing, with one being especially painful and traumatic." She noted that Worker's relationship with Dr. Massey "was inherently unequal," that she was overmedicated and dependent on him for her prescriptions. Dr. Kraemer echoed Dr. Sidle's opinions regarding Worker's ability to work and compete in an open labor market.

In deposition, Dr. Sidle explained that PTSD may now be diagnosed based on a sexual violation. He stated that Dr. Massey was a powerful male authority figure who had financial power over Worker, who she relied on to improve her physical condition, and that it is below the standard of care for a doctor to have sex with a patient because it abuses the power relationship and takes advantage of a vulnerability, especially in a

18

patient like Worker, who was medicated and already feeling bad about herself.  Despite his earlier reports, he testified that there was no apportionment of her psychiatric PD to nonindustrial stressors; that the 100 percent PD was due entirely to her PTSD, which was due entirely to her sexual relationship with Dr. Massey; and that her pain disorder was not responsible for her PD.

In 2017, Dr. Kraemer began treating Worker's PTSD.  The treatment was initially authorized by one of the insurers, then objected to and provided on a self-procured basis.  In March 2017, Dr. Kraemer reported that Worker was still severely depressed and that her untreated PTSD will complicate and delay her recovery from her pain disorder.

### D. Trial Before WCJ; WCJ's Findings and Award; Opinion on Decision[10]

A WCJ held a two-day trial in May and July 2017.  The only witness was Worker, and her testimony focused on her sexual relationship with Dr. Massey.  The evidence included more than 1,000 pages of medical, psychological, or medical-legal reports.  Worker claimed eight years of TD benefits covering the period October 6, 2008, through October 19, 2016.  XL Specialty denied her claims and provided no benefits, arguing that her injuries did not arise out of or in the course of her employment.

The WCJ found that Worker sustained specific injuries on November 27, 2001, and in May 2005, as well as a cumulative trauma through January 15, 2008, to her neck, both arms, and psyche.  Since there is a two-year cap on TD benefits for injuries occurring on or after January 1, 2008 (§ 4656, subd. (c)(2)), the WCJ awarded TD for the period October 6, 2008 through October 6, 2010 only, at the rate of $958.01 per week.  And since the TD occurred more than five years after the 2001 injury, he ordered XL Specialty to pay the TD award.

---

[10]  The WCJ issued an original findings and award, an amended findings and award, and a second amended award to correct clerical errors in the first two awards.  Rather than describe the changes in each award, we describe the WCJ's ultimate findings and award as set forth in his second amended award.

The WCJ found that Worker was 100 percent permanently disabled for the injury to her psyche alone based on Dr. Sidle's report and awarded PD at the rate of $958.01[11] per week beginning October 7, 2010, for life, subject to statutory cost-of-living adjustments. The WCJ awarded future medical care and $219,735.90 in attorney fees to Worker's attorney.

In his opinion on decision, the WCJ noted that the central issue was whether Worker's psychiatric injury was a compensable consequence of her industrial musculoskeletal injuries and that both Dr. Sidle and Dr. Michaels agreed that Worker suffered some degree of psychiatric injury due to chronic pain from her work injuries. The WCJ reasoned that a significant portion of her PD was due to her improper sexual relationship with Dr. Massey. He found that "Dr. Massey was duly and properly authorized to provide treatment" and that over the course of that treatment, he "began to express himself in terms of sexual attraction, sometimes accompanied by intimate touching beyond [what] would be considered appropriate in a medical setting." Dr. Massey went to Worker's home and "made what is usually called an indecent proposal." The WCJ noted that no one claimed the sexual relationship was part of the treatment for Worker's industrial injuries. Thus, the question presented was whether Dr. Massey's actions, which were plainly misconduct, broke the chain of industrial causation. The WCJ did not find any precedent on point. Based on case law regarding other forms of misconduct and the rule of liberal construction, he found that the chain of causation was not broken. He noted that cases have held that additional injuries caused by the negligence of the treating physician are compensable consequences of the treatment provided by the employer.

---

[11] There was an inconsistency in the second amended findings and award regarding the starting weekly rate for total PD payments. In his findings of fact, the WCJ found that the weekly rate for permanent total disability was $1,172.57 per week. But in the award, he stated the weekly rate for permanent total disability was $958.01 per week.

In response to defense arguments that the PTSD was not industrial because the "illicit" conduct occurred in Worker's home and not at work, the WCJ reasoned that "without the incidents of improper remarks and intimate touching that took place in the examining room, the progression from the merely offensive to the truly injurious could not have taken place" and held that the events that "took place during treatment were a proximate cause of psychiatric injury." The WCJ found that Dr. Sidle had convincingly stated that the PD from the three injuries was " 'inextricably intertwined' " and "that the psychiatric PD was largely caused by treatment events due to all three injuries." The WCJ therefore made the PD award joint and several. To avoid further delay in payments to Worker, he ordered Arrowood to pay the award, subject to contribution or reimbursement from XL Specialty.

### E. Petitions for Reconsideration by the WCAB

All three parties petitioned for reconsideration. After the parties petitioned for reconsideration, the WCJ rescinded his original and his amended findings and award and filed the second amended findings and award that addressed some of the points raised in Worker's petition for reconsideration. The parties then filed petitions for reconsideration challenging the second amended findings and award.[12]

XL Specialty's petition challenged the PD award, arguing that under section 3208.3, for a psychiatric injury to be compensable, "actual events of employment must be the predominant cause" of the disability and that the psychiatric PD was due solely to Worker's nonindustrial relationship with Dr. Massey. It asserted her psychiatric injury (PTSD) was not due to any negligent treatment or intentional tort and that the chain of causation was broken when Worker had sex with Dr. Massey in her home. Alternatively, XL Specialty argued that if industrial, then Arrowood was solely

---

[12] The issues raised in Worker's petition for reconsideration were resolved below and are not at issue in these proceedings. We therefore shall not describe them here.

21

responsible for the PD, since Arrowood authorized and paid for the treatment with Dr. Massey. It also argued that the correct date of injury for any cumulative trauma claim was in 2002 (during Arrowood's coverage) and that Dr. Feinberg's report was not substantial evidence since he had not examined Worker for several years when he authored his last report.

Arrowood argued that Worker's psychiatric injuries were not related to her 2001 injury because her psychiatric complaints worsened more than five years after the 2001 injury and she did not amend her application for adjudication of claim to allege a psychiatric injury until 2011. Arrowood relied on the orthopedic experts, who opined that there was no new orthopedic injury or PD due to the 2001 injury. It asserted that the psychiatric injury that developed in 2013 (PTSD) was not a compensable consequence of the 2001 injury, was a separate cause of action under section 5303, and that Arrowood was not liable for any injury arising from Worker's sexual contacts with Dr. Massey since they occurred outside the scope of treatment and Worker was never forced to treat with Dr. Massey. Arrowood also relied on the reports of the psychiatric experts, who had opined that Worker's original psychiatric diagnoses (pain disorder, anxiety, and depression) were due to the cumulative trauma, not the 2001 injury. Arrowood argued that if the psychiatric injury was compensable, it was inappropriate to rely on Dr. Sidle's reports because he did not address apportionment, relied on factors used in the 2005 Schedule—the GAF score—and failed to evaluate the work functions required to rate psychiatric PD under the 1997 Rating Schedule. Arrowood asserted that it was improper to award 100 percent PD since Worker had not rebutted the rating in the 1997 Schedule and that the scheduled rating was prima facie evidence of her PD, which could only be rebutted as set forth in *LeBoeuf v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 234 (*LeBoeuf*). It argued that there was no evidence regarding her ability to compete in the open labor market, that it was improper for Dr. Sidle to opine on that question since he

22

was not a vocational expert, and that the WCJ erred in awarding 100 percent PD without vocational evidence. It also argued that there was no basis to order Arrowood to pay TD or Worker's medical-legal expenses and that XL Specialty was responsible for those benefits.

Worker's answer argued that Dr. Massey's conduct was both unethical and criminal and that the sexual conduct that occurred in his exam room was sufficient to subject him to criminal liability for sexual exploitation of a patient under the Business and Professions Code. She argued that Dr. Massey, who was treating her for all three injuries, made sexual overtures in his office and nurtured a vulnerability in her while she was overmedicated, that he controlled both her medications and her disability benefits, and that the investigations by BAPWC, the police, and the Medical Board caused her major psychological trauma.

The WCJ's report and recommendation on reconsideration repeated the analysis in his opinion on decision. He noted that Dr. Sidle had opined that Worker's disability arose from Dr. Massey's treatment for all three industrial injuries. The WCJ said the identity of the party authorizing and paying for the treatment and the relative contribution of each injury to Worker's orthopedic PD was irrelevant. He rejected XL Specialty's argument regarding the date of the cumulative trauma injury since both orthopedic experts found the date of the cumulative trauma injury was January 15, 2008, and there was evidence of further injurious exposure at work in 2006. He explained that Worker's preexisting psychological stressors did not cause her PTSD, concluded that the PTSD alone was sufficient to support an award of 100 percent PD, and held that a report from a vocational expert is not required under *Milpitas Unified School Dist. v. Workers' Comp. Appeals Bd.* (2010) 187 Cal.App.4th 808 (*Guzman*). He recommended the WCAB grant reconsideration to correct an error in the amount of the weekly TD rate and to hold that XL Specialty alone was responsible for the TD award. Subsequently, in a supplemental

23

brief, Worker conceded that the correct starting rate for total PD payments was $916.33 per week.

The WCAB granted reconsideration in November 2017 and issued its decision after reconsideration in June 2019. The WCAB amended the amounts of the weekly TD and total PD rates, made orders regarding the attorney fees that are not at issue here, and affirmed the award. Arrowood and XL Specialty filed separate petitions for review challenging the WCAB's decision.[13] XL Specialty filed a motion to consolidate the petitions. We denied the motion to consolidate but ordered the petitions considered together for further briefing, oral argument, and disposition.[14]

---

[13] Four documents that Petitioners submitted as exhibits to their petitions for writ of review were not in the certified record filed by the WCAB. The documents were: (1) the Stipulations with Request for Award dated June 10, 2005, and the Award filed on July 6, 2005; (2) Worker's Petition to Reopen dated October 17, 2006; (3) the Stipulation and Award and/or Order dated January 4, 2011; and (4) the minutes of the hearing and summary of evidence for the second day of trial dated July 13, 2017. On our own motion, we considered judicially noticing these omitted documents and requested supplemental briefing from the parties on the propriety of taking judicial notice and the tenor of the matter to be judicially noticed. (Evid. Code, §§ 455, subd. (a), 459, subd. (c).) In its response, the WCAB explained that these documents may have been omitted from the record because they were filed before the WCAB instituted its electronic document management system or due to errors at the district office level. The only party to object was the WCAB. And it objected to the court taking judicial notice of only the second document listed above on the ground that there was insufficient indicia on the exhibit that it was ever filed with the WCAB. In light of this, we shall take judicial notice of documents 1, 3, and 4 listed above, but not document 2.

[14] On September 10, 2020, after we denied the motion to consolidate, XL Specialty filed a brief in opposition to Arrowood's petition for review. Arrowood has objected to the filing of this brief. Since we denied consolidation, XL Specialty is not a party to the writ proceeding filed by Arrowood. In addition, XL Specialty's brief is not authorized by California Rules of Court, rule 8.720, or this court's order granting review, and XL Specialty did not obtain leave of court to file its September 10, 2020 brief. For these reasons, we shall not consider it further.

24

## IV. DISCUSSION

### A. *Standard of Review*

This court is authorized to review WCAB decisions and to issue a writ of review but may not exercise "its independent judgment on the evidence." (§§ 5950, 5952.) The WCAB's findings on questions of fact "are conclusive and final so long as, based on the entire record, they are supported by substantial evidence." (*Save Mart Stores v. Workers' Comp. Appeals Bd.* (1992) 3 Cal.App.4th 720, 723.) Its conclusions on questions of law are reviewed de novo and when the reviewing court is asked to interpret and apply a statute to undisputed facts, the review is also de novo. (*Benson v. Workers' Comp. Appeals Bd.* (2009) 170 Cal.App.4th 1535, 1543 (*Benson*).)

"Whether an industrial injury proximately causes a later injury or death within the meaning of section 3600 is a question of fact. [Citations.] 'Judicial review of the Board's decision on factual matters is limited to determining whether the decision, based on the entire record, is supported by substantial evidence.' [Citations.] In this context, judicial review has been expressly limited by statute to whether the award 'was not supported by substantial evidence' and the factual findings 'support the . . . award.' (§ 5952, subds. (d), (e).) Indeed, section 5952 expressly provides that '[n]othing in this section shall permit the court . . . to exercise its independent judgment on the evidence.' " (*South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291, 302-303 (*South Coast*).) "The WCJ's findings of fact, and the Board's adoption of them, 'are final and conclusive and not subject to appellate review if supported by substantial evidence in light of the entire record. [Citations.] Substantial evidence must be reasonable in nature, credible, and of solid value such that a reasonable mind might accept it as adequate to support a conclusion. [Citation.] In examining the entire record, this court "may not simply isolate evidence which supports or disapproves the board's

25

conclusions and ignore other relevant facts which rebut or explain the supporting evidence . . . ." ' " (*Id*. at p. 303.)

### B. Analysis of Contentions on Writ Review

### 1. We reject XL Specialty's assertion that the proper date of injury for the cumulative trauma claim was in March 2002

XL Specialty contends the WCJ erred in finding a cumulative trauma injury in 2008 (during its coverage) and that Arrowood is responsible for the cumulative trauma claim because the correct date of injury for the cumulative trauma injury was in 2002 (during Arrowood's coverage). XL Specialty asserts that substantial evidence supports finding that the date of injury for the cumulative trauma claim was in March 2002 because Worker was temporarily disabled by her cumulative injury at that time.

An industrial injury may be either " 'specific' " or " 'cumulative.' " (§ 3208.1.) A specific injury occurs "as the result of one incident or exposure which causes disability or need for medical treatment." (§ 3208.1.) A cumulative injury is due to "repetitive mentally or physically traumatic activities extending over a period of time, the combined effect of which causes any disability or need for medical treatment." (§ 3208.1.)

Regardless of the length of the cumulative exposure—which was arguably from November 2001 to January 2008—liability for a cumulative trauma injury is limited by statute to the injured worker's employer or employers during the *one year* immediately "preceding either the date of injury, as determined pursuant to section 5412, or the last date on which the employee was employed in an occupation exposing . . . her to the hazards of the . . . cumulative injury, whichever occurs first." (§ 5500.5, subd. (a).)

Section 5412 provides that the "date of injury" for cumulative trauma injuries is the "date upon which the employee first suffered disability therefrom" and the employee "either knew, or in the exercise of reasonable diligence should have known, that such disability was caused by . . . present or prior employment." Thus, determining the date of injury in a cumulative trauma case requires "the concurrence of the date of first

26

compensable disability and the date of the employee's knowledge of the injury's industrial relationship. [Citation.] These elements present questions of fact to be determined by the [WCAB] and the burden of proving them is on the employer. [Citation.] In general, an employee is not charged with knowledge that his or her disability is job-related without medical advice to that effect." (*Newton v. Workers' Comp. Appeals Bd.* (1993) 17 Cal.App.4th 147, 156, fn. 16 (*Newton*).) Disability as used in section 5412 means either compensable TD or PD. Medical treatment alone is not disability, but it may be evidence of compensable PD, as may a need for splints and modified work. (*State Comp. Ins. Fund v. Workers' Comp. Appeals Bd.* (2004) 119 Cal.App.4th 998, 1005-1006.) The date of injury for a cumulative trauma claim may be months or years before the employee's last day worked or years after the employee stops working. (*Western Growers Ins. Co. v. Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th 227, 239 (*Western Growers*) [date of cumulative trauma injury was in 1985 even though employee continued working until 1987]; 1 Cal. Workers' Compensation Practice (Cont.Ed.Bar 4th ed. 2003) § 11.52 (rev. 3/19) (hereafter Workers' Comp. Practice).)

"In any given situation, there can be more than one injury, either specific or cumulative or a combination of both, arising from the same event or from separate events. [Citations.] The number and nature of the injuries suffered are questions of fact for the WCJ or the WCAB. [Citations.] For example, if an employee becomes disabled, is off work and then returns to work only to again become disabled, there is a question of fact as to whether the new disability is due to the old injury or whether it is due to a new and separate injury." (*Western Growers*, *supra*, 16 Cal.App.4th at p. 234.)

The WCJ found that Worker sustained specific injuries on November 27, 2001 and in May 2005, and a cumulative trauma injury "during the period ending 1/15/2008," the last day that she worked. XL Specialty contends the date of the cumulative trauma injury

27

was not Worker's last day worked, but much earlier in March 2002, when there was a concurrence of disability and knowledge.  Since the date of cumulative injury is a question of fact for the WCAB, our task is to determine, in light of the entire record, whether substantial evidence supports the WCJ's and WCAB's finding.  (*Newton*, *supra*, 17 Cal.App.4th at p. 156, fn. 16.)

Worker's assertion of a specific injury claim in 2001 does not bar a later cumulative trauma claim based on evidence of continuing exposure to injury-causing events at work.  (*Western Growers*, *supra*, 16 Cal.App.4th at p. 234; see, e.g., *Aerospace Corp. v. Workers' Comp. Appeals Bd.* (2016) 81 Cal.Comp.Cases 838 [writ denied; injured worker who claimed specific injury in 1998 also suffered cumulative injury ending in 2011 where there was evidence that he experienced repeated injurious exposures after returning to work following first injury].)   The WCAB has held that the acceleration or aggravation of a preexisting industrial injury is compensable as a new separate injury, if the aggravation is reasonably attributable to the injured worker's subsequent employment.  (*Ponce v. Barrett Business Services, Inc.* (2017) 82 Cal.Comp.Cases 786, 789 [truck driver with specific injury to shoulder returned to work and suffered cumulative injury to his wrist due to repeated injurious exposures after he adjusted the way he performed his work tasks following shoulder surgery], citing *Smith v. Workmen's Comp.App.Bd.* (1969) 71 Cal.2d 588.)

Here, there was ample evidence of continued exposure to injury-causing events after 2002 that supported the WCJ's finding of cumulative injury through January 15, 2008.  Notably, when settling her 2001 injury, Worker and Arrowood stipulated that she sustained a specific injury to her neck and right arm on November 27, 2001.  She did not suffer any disability from that injury until March 2002, when Dr. Jayakar reduced her work hours to four hours per day.  In August 2002, her hours were increased, and in October 2002, the doctor released her to return to work full time, but told her to limit her

28

keyboard use.  In November 2002, Worker was "working 8 hours per day and typically keyboarding between 4-6 hours per day on an intermittent basis."  Worker continued working.  In January 2004, she returned to Dr. Jayakar.  Worker said she continued to do her regular job but was not always able to limit her keyboarding to four hours per day.  Since she complained of increased symptoms, Dr. Jayakar placed her back on part-time work.  In April 2004, Dr. Jayakar released her back to full time work and again told her to limit her keyboarding to four hours per day.  During these periods of partial temporary disability in 2002 and 2004, Worker received salary continuance benefits from her employer.  Dr. Jayakar declared her injuries to her neck and right arm permanent and stationary in 2002 and again in April 2004.

In May 2005, Worker complained of new symptoms in her left wrist and palm, due to "using her left arm more for mousing."  Applied Materials treated this as a new, separate injury and referred her to a different physician, Dr. Paul Ware.  By that time, Applied Materials had changed workers' compensation carriers and XL Specialty was providing the coverage.  In August 2005, Worker gave a history of a gradual onset of left wrist, left elbow, and left upper back pain due to repeated use of her computer mouse over the previous six months.  She was still performing her usual duties.  Dr. Holmes (the orthopedic QME for XL Specialty's claims) later opined that "there was a very specific worsening of her symptoms in 2005."  Dr. Feinberg described her condition as an "overuse syndrome" and opined that her condition worsened in 2005.

In March 2006, Worker started calling in sick because of increased pain in her right arm and neck.  On April 4, 2006, Dr. Jayakar took her off work for three weeks; shortly thereafter she referred her to BAPWC.  Worker remained off work until January 2007, when Dr. Gowda released her to return to work part-time.  On September 13, 2007, Dr. Massey released her to "full-time" work, and she continued to work full time until she was laid off on January 15, 2008.

29

In summary, there is evidence that after injuring her right arm and neck in November 2001, Worker continued working—on at least a part-time basis and often full time—until March 2006, when she was first totally temporarily disabled by her injuries. During that over four-year period, Worker was exposed to additional injury-causing events, complained of new injuries to her left arm due to repeated use of her left arm for computer work in 2005. And except for a nine-month period of total TD in 2006, she continued to work and experience such exposure through January 2008. The record does not indicate precisely when XL Specialty took over the coverage, but it appears that Worker worked for at least 23 months during XL Specialty's coverage period (from May 2005 to March 2006 and from January 2007 to January 2008). Dr. Holmes opined that her physical injuries were due to prolonged cumulative exposure at work from 2001 until 2008. Dr. Feinberg opined that any increase in her disability after the 2001 injury was due to ongoing cumulative trauma up to her last day of work. Thus, substantial evidence supports the WCJ's finding of cumulative trauma during XL Specialty's coverage. For these reasons, we reject XL Specialty's assertion that the correct date of injury for the cumulative trauma was in March 2002.

**2. Industrial Causation: Worker's psychiatric disability that arose out of her sexual exploitation by Dr. Massey was compensable**

Both Arrowood and XL Specialty argue that Worker's psychiatric disability is not industrial, that Worker broke the chain of industrial causation when she entered into a personal relationship with Dr. Massey outside of the medical setting, and that her PTSD did not arise out of the employment because the sexual activity between Dr. Massey and Worker occurred in Worker's home, did not involve medical treatment, and was consensual. They also argue that it would be inequitable to hold the employer liable in this case. Since there is no authority directly on point, the parties analogize to other types

30

of cases where industrial causation was at issue, including cases involving medical negligence in treating industrial injuries and assaults by third parties.

Worker responds that her psychiatric disability is industrial because Dr. Massey treated her for her industrial injuries, controlled her medications and financial well-being, and kept her in an overmedicated state. She contends that the employer directed her to Dr. Massey, that Dr. Massey used his superior position in the doctor-patient relationship "to create a position of trust," which he then violated; that both psychiatric QME's opined that his conduct was inappropriate; and that the inappropriate conduct occurred not only in Worker's home, but also in Dr. Massey's clinic. She argues that the conduct was a form of compensable medical negligence, that both case law and statute provide that the doctor-patient relationship is inherently unequal, and that a patient cannot consent to a sexual relationship with her physician. As noted, the WCJ found the psychiatric injury that was due to the sexual exploitation by Dr. Massey was industrial.

Workers' compensation liability exists "in lieu of any other liability whatsoever" and "without regard to negligence" "against an employer for any injury sustained by [its] employees arising out of and in the course of the employment" where specified "conditions of compensation concur." (§ 3600, subd. (a).) There are 10 conditions of compensation. At issue here are conditions 2 and 3: "(2) Where, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment. [¶] (3) Where the injury is proximately caused by the employment, either with or without negligence." (§ 3600, subd. (a)(2), (3)).

" ' "The requirement of . . . section 3600 is twofold. On the one hand, the injury must occur 'in the course of the employment.' This concept 'ordinarily refers to the time, place, and circumstances under which the injury occurs.' [Citation.] . . ." [Citation.] [¶] "On the other hand, the statute requires that an injury 'arise out of' the employment . . . .

31

It has long been settled that for an injury to 'arise out of the employment' it must 'occur by reason of a condition or incident of [the] employment. . . .' [Citation.] That is, the employment and the injury must be linked in some causal fashion." ' " (*South Coast supra*, 61 Cal.4th at p. 297.) The applicant for workers' compensation benefits has the burden of establishing the reasonable probability of industrial causation by a preponderance of the evidence. (*Latourette v. Workers' Comp. Appeals Bd.* (1998) 17 Cal.4th 644, 650 (*Latourette*).)

Tort law and the workers' compensation law are "significantly different" in their "application of causation principles." (*South Coast*, *supra*, 61 Cal.4th at p. 297.) While both use the phrase "proximate cause," "[t]ort liability only attaches if the defendant's negligence was a *significant or substantial factor* in causing injury." (*Id.* at p. 299; italics added.) On the other hand, "the workers' compensation system is not based upon fault. 'It seeks (1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society, (2) to guarantee prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production, (3) to spur increased industrial safety, and (4) in return, to insulate the employer from tort liability for [its] employees' injuries.' " (*South Coast*, at p. 298.) "Proximate cause" in workers' compensation cases has been interpreted as merely elaborating on the requirement that the injury arise out of the employment. " ' " 'All that is required is that the employment be one of the contributing causes without which the injury would not have occurred.' " ' " (*Id.* at pp. 297-298.) The proximate cause language in section 3600 is " 'less restrictive than that used in tort law, because of the statutory policy . . . favoring awards of employee benefits.' " (*South Coast*, at p. 298; *Latourette*, *supra*, 17 Cal.4th at p. 651 [in applying § 3600, the court must be guided by the " 'fundamental principle that the requirement is to be liberally construed *in favor of awarding benefits*' "].)

"[W]orkers' compensation liability may . . . encompass a subsequent nonindustrial injury . . . attributable to the initial industrial accident." (*South Coast*, *supra*, 61 Cal.4th at p. 297.) It has long been the rule that "the aggravation of an industrial injury or the infliction of a new injury resulting from its treatment or examination are compensable under the [Workers' Compensation Act] and, therefore, within the exclusive cognizance of the [WCAB]." (*Fitzpatrick v. Fidelity & Casualty Co.* (1936) 7 Cal.2d 230, 232.) As the Supreme Court explained in *South Coast*, "industrial causation has been shown in an array of scenarios where a work injury contributes to a subsequent nonindustrial injury. An employee is entitled to compensation if a new or aggravated injury results from medical or surgical treatment for an industrial injury. ([Citation]; *Georgia Casualty Co. v. Indus. Acc. Com.* (1927) 87 Cal.App. 333, 334-335 . . . [death from anesthetic]; see *Maher* [*v. Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 729,] 735-738 [adverse drug reaction when treatment was required for employment]; *Ballard v. Workmen's Comp.App.Bd.* (1971) 3 Cal.3d 832, 837-839 . . . [drug addiction to prescribed pain medication].) Causation may also be shown if an industrial injury contributes to a later nonindustrial accident or injury. (See *Lundberg v. Workmen's Comp.App.Bd.* (1968) 69 Cal.2d 436, 439-441 . . . [industrial back injury contributed to later ruptured disc]; *Ferreira v. Workmen's Comp. Appeals Bd.* (1974) 38 Cal.App.3d 120, 124-126 . . . [hernia suffered at work contributed to later hernia suffered at home]; *State Comp. Ins. Fund v. Ind. Acc. Com.* (1959) 176 Cal.App.2d 10, 13-21 . . . [carpenter's industrial eye injury contributed to later nonindustrial accident while using a saw at home].) Indeed, even a worker's suicide may be compensable if an industrial injury contributed to it. [Citations.]" (*South Coast*, at p. 300.) In *South Coast*, the court held that an injured worker's death from respiratory failure at home was industrial because medications he took for an industrial injury were a contributing cause of death where the QME testified

33

that those medications played a *small* role in causation:  more than 0 percent but less than 20 percent.  (*Ibid*.)

An employee is entitled to compensation for a new or aggravated injury that results from the medical treatment of an industrial injury, whether the doctor was furnished by the employer, the insurance carrier, or was selected by the employee. (*Hikida v. Workers' Comp. Appeals Bd*. (2017) 12 Cal.App.5th 1249, 1262 (*Hikida*) citing *Fitzpatrick v. Fidelity & Casualty Co*., *supra*, 7 Cal.2d at p. 232.)  "Aggravation of the original injury by medical treatment is considered 'a foreseeable consequence of the original compensable injury, compensable within the workers' compensation proceeding and not the proper subject of an independent common law damage proceeding against the employer.' "  (*Hikida*, at p. 1261.)  This rule derived "from (1) the concern that applying apportionment principles to medical care would delay and potentially prevent an injured employee from getting medical care, and (2) the fundamental proposition that workers' compensation should cover all claims between the employee and employer arising from work-related injuries, leaving no potential for an independent suit for negligence against the employer."  (*Id*. at p. 1263.)  In *Hikida*, the court concluded that the injured worker's chronic regional pain syndrome (CRPS) that was the result of a failed surgery for her industrial carpal tunnel syndrome, was industrial and awarded permanent total disability based on the CRPS.  (*Id*. at p. 1262.)

Petitioners argue that this theory of causation does not apply since it was undisputed that the sexual conduct was not medical treatment, the sexual relationship was consensual, and the sex acts occurred in Worker's home.  Worker responds that her treatment was a contributing cause of her PTSD because Dr. Massey prescribed excessive amounts of medication, which made it difficult for her to resist his advances; he was in a superior position in the doctor-patient relationship and controlled both her treatment and

34

disability benefits; and he made sexual advances in his exam room that groomed her for the sexual exploitation that occurred in her home.

Based on our review of the record, we conclude that Worker met her burden of demonstrating that her PTSD was a new injury that resulted from the treatment for her industrial injuries and that her employment was one of the contributing causes without which the sexual exploitation by Dr. Massey and her PTSD would not have occurred. Multiple QME's reported for years that Worker was overmedicated, which affected her ability to function, and Dr. Massey was prescribing five or six drugs at the time of their sexual contact. In early 2013, about the time that Dr. Massey started making inappropriate sexual comments to Worker, Dr. Sidle reported that she was in a very vulnerable state and urgently needed inpatient psychiatric treatment. Dr. Sidle concluded that Worker's PTSD, which was due to her sexual exploitation by Dr. Massey, was "100% industrial" because Dr. Massey was treating her physical, accepted industrial injuries. Dr. Jayakar referred Worker to BAPWC for treatment of her industrial injuries and Dr. Massey took over that treatment in 2007. By the time the sexual exploitation occurred, Dr. Massey had been treating her industrial injuries for six years, and Arrowood and Worker had stipulated that he would continue to treat her industrial injuries and that Arrowood would continue to authorize all reasonable requests for medical treatment. Dr. Sidle opined that having a sexual relationship with a patient is illegal, unethical, and below the standard of care because it abuses the power relationship between doctor and patient and takes advantage of a vulnerability, especially in a patient like Worker who was overmedicated and already feeling bad about herself. These facts support the conclusion that the medication and treatment provided for Worker's industrial injuries was a contributing cause of Worker's PTSD and disability.

XL Specialty argues that Worker's PTSD is not industrial because, unlike cases described in *South Coast*, it is not the result of negligent medical treatment. To prove

35

professional negligence, the patient must demonstrate that the treatment fell below the standard of care. (*Turpin v. Sortini* (1982) 31 Cal.3d 220, 229 [elements of cause of action for professional negligence].) Dr. Sidle testified that it was below the standard of care for a physician to have sex with a patient because it abuses the power relationship between doctor and patient and takes advantage of a vulnerability. The WCJ reasoned that Dr. Massey had a duty of care to Worker as her treating physician and that he breached that duty of care by using his position as her physician, together with the diminished capacity brought about by her medication, to induce her to engage in otherwise unwanted sexual relations. The WCJ reasoned that that breach of duty caused harm and that since Worker's psychiatric disability was caused in part by Dr. Massey's negligence, it was compensable. We conclude the evidence outlined above is substantial evidence that supports the WCJ's conclusions.

XL Specialty cites *Atienza v. Taub* (1987) 194 Cal.App.3d 388, which held that a patient could not maintain a civil action for medical malpractice against her doctor based on alleged sexual misconduct unless the doctor initiated the sexual relationship under the guise of medical treatment. XL Specialty's reliance on *Atienza* is misplaced. In 1993— after *Atienza* was decided and long before the conduct at issue here—the Legislature enacted Business and Professions Code section 729, which provides that certain health care providers, including physicians, who engage in "sexual intercourse . . . or sexual contact with a patient" are guilty of the criminal offense of "[s]exual exploitation," which is punishable as a misdemeanor or a felony depending on the number of acts or victims. (Bus. & Prof. Code, § 729, subds. (a) & (b).) The patient's consent is not a defense. (*Id.*, subd. (b).) The statute also provides that *a physician* "shall not be guilty of sexual exploitation for touching any intimate part of a patient . . . unless the touching is outside the scope of medical examination and treatment, or . . . is done for sexual gratification." (*Ibid.*) It was undisputed that the sexual contact here was outside the scope of medical

36

treatment and done for Dr. Massey's sexual gratification.  The statute defines "sexual contact" as "sexual intercourse or the touching of an intimate part of a patient for the purpose of sexual arousal, gratification, or abuse."  (Bus. & Prof. Code, § 729, subd. (c)(3).)  Under the common law doctrine of negligence per se, Business and Professions Code section 729 may be used to establish duties and standards of care in a negligence action.  (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 927.)

Petitioners argue that Worker's PTSD was not compensable because it was the result of a consensual sexual relationship that occurred in Worker's home and not at her workplace or Dr. Massey's clinic.  Contrary to Petitioners' arguments, under Business and Profession Code section 729, subdivision (b), consent is not a defense.  Thus, it is irrelevant whether Worker consented.  In addition, the sexual exploitation was not limited to Worker's home.  Under the statutory definition of "sexual contact," which includes "the touching of an intimate part of a patient for the purpose of sexual arousal, gratification, or abuse" (Bus. & Prof. Code, § 729, subd. (c)(3)), the sexual touching that occurred at BAPWC while Dr. Massey was treating her is a form of sexual exploitation.[15]

XL Specialty's reliance on *Atascadero Unified School District v. Workers' Comp. Appeals Bd*. (2002) 98 Cal.App.4th 880 is misplaced.  In that case, the court held that there was an insufficient causal nexus between an alleged psychiatric injury that arose from workplace gossip about the employee's extramarital affair with a coworker to support a finding of industrial causation merely because the gossip occurred at work.  The court reasoned that "gossip about an employee's personal life is not part of the employee-employer relationship," that the "off-duty affair had nothing to do with her employment," and that even though the gossip occurred at work, "the nature of her duties was not the proximate cause of her injury for it merely provided a stage for the event."

---

[15]  Our conclusion is limited to whether Worker has met her burden of demonstrating a sufficient causal connection for the purpose of demonstrating causation under the workers' compensation laws.

(*Id.* at p. 885.) Thus, the court held that "the employment was not a contributory cause of the injury." (*Ibid.*) *Atascadero* is factually distinguishable since it did not involve a compensable consequence injury that was the result of medical treatment provided by the employer.

Petitioners argue that the PTSD is not compensable because Dr. Massey's conduct was deliberate and intentional. They analogize to industrial injuries arising out of assaults by third parties. "[W]hether an assault at the hands of a third person" arises out of the employment "depends upon 'whether the assault is . . . made by reason of circumstances connected with the employment or without any relation thereto.' " (*Western Airlines*, *supra*, 155 Cal.App.3d at p. 369; *id*. at p. 371 [psychiatric injury caused by rape of flight attendant on a layover was nonindustrial because there was no evidence her employment contributed in any way to her selection as the victim].) Worker presented substantial evidence that her sexual exploitation by Dr. Massey was connected to her employment and that her employment was a contributing cause under *Western Airlines*. She was assaulted by the physician who was treating her industrial injuries; who was a member of her employer's MPN; and whose treatment was authorized and paid for by Arrowood, subjected to utilization review by the employer, and should have been authorized by XL Specialty to treat her industrial injuries.

Since we conclude that the disability due to Dr. Massey's sexual exploitation is compensable as a consequence of the medical treatment provided by the employer or as an employment-related assault by a third party, we shall not address Petitioners' other causation arguments.

### 3. XL Specialty is jointly and severally liable for the PD caused by the sexual exploitation by Dr. Massey

XL Specialty argues that if Worker's disability is compensable, it is due to the 2001 injury and Arrowood is solely liable because it provided the treatment and XL

38

Specialty did not authorize or pay for any treatment at BAPWC. Thus, XL Specialty seeks to overturn the WCAB's finding of joint and several liability.

XL Specialty cannot escape liability by simply denying the claim and refusing to pay benefits. As noted, there is substantial evidence of injury-causing events and new injuries during XL Specialty's coverage. Dr. Sidle, the psychiatric QME for the cumulative trauma claim, opined repeatedly (in 2011, 2013, and 2015) that the predominant cause of the psychiatric injury for which Worker was treated at BAPWC was the cumulative trauma and that her psychiatric injury was a compensable consequence of her physical injuries due to the cumulative trauma ending in 2008. Dr. Michaels (the psychiatric QME for the 2001 injury) agreed that the psychiatric injury was most likely due to cumulative trauma through 2008, and Dr. Holmes (the orthopedic QME for the cumulative trauma claim) opined that the injuries to Worker's neck and arms were due to a prolonged cumulative trauma ending in 2008. Worker was treated at BAPWC from August 2006 until December 2013, which was after she complained of new injuries in 2005, and the majority of the treatment by Dr. Massey occurred after she stopped working in 2008. Although Arrowood authorized the treatment, the record supports the conclusion that some, if not most, of the treatment at BAPWC was for the 2005 and 2008 injuries. There is no merit to XL Specialty's argument that it cannot be held jointly and severally liable for Worker's PD.

**4. XL Specialty's challenges to Dr. Feinberg's reports lack merit**

XL Specialty challenges the finding of injury during its policy period, arguing that the opinions of orthopedic AME Dr. Feinberg on causation, which the WCJ found definitive, are not substantial evidence because although Dr. Feinberg examined Worker in 2006 and 2011, he did not reexamine her when he prepared two supplemental reports in 2017. XL Specialty also argues that Dr. Feinberg did not have a complete medical file in 2017.

39

There is no merit to these challenges. When Dr. Feinberg examined Worker in 2011, he reviewed 10 inches of medical records dating from 1989 to 2011. His summary of those records was 22 pages long. In 2011, he opined regarding causation. Initially, he said her upper body condition was "partially related to the 2001 injury and partially due to cumulative trauma until her last day of work." He later stated he did not disagree with Dr. Holmes (the QME for XL Specialty's claims), who found that her physical injuries were due to cumulative trauma between 2001 and 2008. By 2011, Worker had not worked for three years and Dr. Feinberg had all the information he needed to opine regarding causation. It is true that Dr. Feinberg did not reexamine Worker when he wrote two supplemental reports in 2017, but contrary to XL Specialty's assertion, Dr. Feinberg did review another 2.5 inches of medical records in 2017. Although he rendered new opinions regarding PD and apportionment in 2017, he did not render any new opinions about the cause of her orthopedic injuries. Thus, the fact that he did not reexamine Worker in 2017 did not render his opinions on causation insubstantial.

**5. Substantial evidence supports the WCAB's finding of psychiatric injury due to the 2001 injury**

Arrowood argues that the facts do not support a finding of psychiatric injury due to the 2001 injury. We disagree.

The first mention of any injury to the psyche was in mid-2006 when Worker told an orthopedic surgeon she consulted that she was depressed secondary to her physical injuries, Dr. Garavanian (a psychologist) diagnosed a pain disorder, and Dr. Gowda diagnosed depression. This was months before Worker filed her petition for new and further disability due to the 2001 injury. Years later, in 2011—long before the sexual exploitation by Dr. Massey—both psychiatric experts agreed that Worker's pain disorder, depression, and anxiety that were consequences of her physical injuries were due to the cumulative trauma, not the 2001 injury. At that time, since XL Specialty was the carrier

40

for the cumulative trauma claim, the record supported a conclusion that XL Specialty was solely responsible for the psychiatric injuries that were a compensable consequence of her physical injuries. (§ 5500.5.)

But the nature of Worker's psychiatric injury claim changed after Dr. Kraemer diagnosed PTSD in 2014. The psychiatric injury changed from being a compensable consequence of Worker's physical injuries to being a compensable consequence of the sexual exploitation by her doctor, which we have concluded is compensable. Dr. Sidle ultimately opined that her PD was due entirely to the PTSD, which was due entirely to her sexual exploitation by Dr. Massey. Since Dr. Massey treated Worker for all three injuries, Dr. Sidle opined that the cause of her PD was inextricably intertwined between all of her dates of injury so that it would be difficult, if not impossible, to say what portion of her psychiatric disability was due to which injury. The record suggests Arrowood, not XL Specialty, authorized the treatment with BAPWC starting in 2006. In 2011, Arrowood stipulated that it would continue to provide medical treatment with Dr. Massey as the primary treating physician. Although Arrowood argues that Worker could have changed doctors when it established an MPN in 2012, it also admits that Dr. Massey was in its MPN. In light of the entire record, these facts constitute substantial evidence which support the WCJ's finding that Worker's psychiatric PD "was largely caused by treatment events due to all three injuries," which include the treatment Arrowood provided for the 2001 injury.

### 6. Substantial evidence supports the WCAB's finding of new and further disability within five years of the 2001 injury

Arrowood argues that Worker did not suffer any new and further disability from her 2001 injury, including psychiatric injury, because her alleged new and further disability arose more than five years after November 27, 2001, the date of injury for its claim. Arrowood's petition does not distinguish between the depression and anxiety that

41

were compensable consequences of Worker's physical injuries (for which she received treatment before November 27, 2006) and the PTSD that was a compensable consequence of her sexual exploitation by Dr. Massey (which arose in 2013). It argues simply that the WCJ erred in finding that the 2001 injury caused new and further injury, including injury to her psyche.[16] Arrowood acknowledges that Worker filed a timely petition to reopen but argues, correctly, that in addition to filing a timely petition, she must have sustained new and further disability within the five-year limitations period. (*Sarabi v. Workers' Comp. Appeals Bd.* (2007) 151 Cal.App.4th 920, 925 (*Sarabi*).) Citing the reports of Dr. Feinberg (the orthopedic AME for the 2001 claim) and Dr. Holmes (the orthopedic QME for the cumulative trauma claim), Arrowood argues that there was no evidence of any new and further disability due to the 2001 injury, and that any new orthopedic disability was due to the cumulative trauma covered by XL Specialty. Arrowood asserts that Worker was first treated for her depression in 2008 and did not "allege a psychiatric injury as a compensable consequence until 2011."

Two statutes govern petitions to reopen. First, under section 5410, "an injured worker who has previously received workers' compensation benefits either voluntarily paid by the employer or pursuant to an award is entitled to claim benefits *for 'new and further disability'* within five years of the date of injury." (*Sarabi*, *supra*, 151 Cal.App.4th at p. 925, italics added.) Second, "[s]ection 5803 permits the reopening of a previously adjudicated case *for 'good cause'* upon a petition filed by [any] party, also

---

[16] At oral argument, Arrowood argued for the first time in this proceeding that it was not liable for Worker's PTSD claim, as distinguished from her claim of general injury to her psyche, because it arose more than five years after the 2001 injury. "We do not consider arguments that are raised for the first time at oral argument." (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1554, fn. 9.) Since Arrowood did not raise this point in its briefing in this court, it has been forfeited. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761 [issues not properly addressed in the opening brief will be disregarded].)

within five years from the date of injury.  If a petition to reopen under either section is filed within the five-year period, the [WCAB] has jurisdiction to decide the matter beyond the five-year period."  (*Ibid*., italics added.)

To recover additional benefits, the injured worker must not only file a timely petition to reopen but must also have suffered a "new and further disability" within that five-year period, unless there is otherwise "good cause" to reopen the prior award.  (*Sarabi*, *supra*, 151 Cal.App.4th at p. 926.)  An injured worker cannot confer jurisdiction on the WCAB by filing a petition to reopen before the five-year period has expired for anticipated new and further disability that *may* occur after the five-year limitation period has run.  (*Ibid*.)  "New and further disability" means disability resulting from some demonstrable change in the employee's condition, including a gradual increase in disability, a recurrence of TD, a new need for medical treatment, or the change of a temporary disability into a permanent disability.  (*Ibid*.)

Arrowood's assertions ignore the timeline and substantial medical evidence that supports the WCJ's finding of new and further disability, including psychiatric disability, prior to November 27, 2006 (the five-year anniversary of Worker's 2001 injury).  Worker claimed physical injuries in 2005 that overlapped her 2001 injury claim.  She saw at least eight doctors between May 2005 and November 2006.  Contrary to Arrowood's assertion that Worker first treated for her depression in 2008, there was substantial evidence of "a new need for medical treatment" before November 27, 2006, including treatment for injuries to Worker's psyche, that satisfied the definition of new and further disability in *Sarabi*, *supra*, 151 Cal.App.4th at page 926.  Dr. Fujimoto referred her to a psychologist for pain management in March 2006.  In April 2006, Worker complained to a consulting orthopedist that she was depressed secondary to her industrial injuries.  Dr. Garavanian diagnosed a psychological pain disorder and a sleep disorder in July 2006, and Dr. Gowda requested authorization to treat her depression in August 2006.  In September

43

2006, Dr. Gowda prescribed medication for her severe anxiety and referred Worker to Dr. Garavanian for psychotherapy follow-up. On November 2, 2006, Worker told Dr. Gowda that her anxiety was so high that her medication "was not covering her anxiety symptoms" and she could not continue in her first attempt at the functional restoration program. Arrowood authorized and voluntarily paid for the treatment described above pursuant to the open medical award on the 2001 claim. Based on this record, Worker met her burden of demonstrating that she suffered a new need for medical treatment, including treatment for injury to her psyche, before November 27, 2006. This was substantial evidence that supported the WCJ's finding of new and further disability from the 2001 injury.

### 7. The 2005 Schedule applies to PD based on psychiatric injury arising out of the 2001 injury claim

Arrowood contends that Dr. Sidle's reports are not substantial evidence of PD with regard to the 2001 injury because the 1997 Schedule applies to the 2001 injury claim and Dr. Sidle evaluated Worker's PD according to the GAF scale in the 2005 Schedule and did not evaluate her impairment of eight work functions as required to rate psychiatric PD under the 1997 Schedule.[17]

---

[17] The eight work functions included: "1. Ability to comprehend and follow instructions. [¶] 2. Ability to perform simple and repetitive tasks. [¶] 3. Ability to maintain a work pace appropriate to a given work load. [¶] 4. Ability to perform complex and varied tasks. [¶] 5. Ability to relate to other people beyond giving and receiving instructions. [¶] 6. Ability to influence people. [¶] 7. Ability to make generalizations, evaluations or decisions without immediate supervision. [¶] 8. Ability to accept and carry out responsibility for direction, control and planning." (1997 Schedule, p. 2-3.) The 1997 Schedule directed the physician to rate the level of impairment for each work function as "Minimal," "Very Slight," "Slight," "Slight to Moderate," "Moderate," "Moderate to Severe," or "Severe." (*Ibid*.) It also contained a chart for converting the impairment ratings to a percentage of disability and instructions for rating psychiatric PD depending on the number and type of work function impairments. (*Ibid*.)

"Section 4660 prescribes the method for determining the percentages of permanent disability for workers' compensation purposes" (*Chang v. Workers' Comp. Appeals Bd.* (2007) 153 Cal.App.4th 750, 753 (*Chang*)) for "injuries occurring before January 1, 2013" (§ 4660). It currently provides in part: "In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his or her age at the time of the injury, consideration being given to an employee's diminished future earning capacity." (§ 4660, subd. (a).) "A schedule for assessing permanent disability had been required since 1937." (*Guzman*, *supra*, 187 Cal.App.4th at p. 818.) The schedule has been updated periodically by the administrative director of the Department of Industrial Relations, Division of Workers' Compensation (Administrative Director), most recently in 1997 and 2005.

In 2004, the Legislature enacted comprehensive reforms of the workers' compensation laws with the passage of Senate Bill No. 899 (Senate Bill 899). (Stats. 2004, ch. 34, effective Apr. 19, 2004; *Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1323 (*Brodie*).) Senate Bill 899 was an urgency measure "designed to alleviate a perceived crisis in skyrocketing workers' compensation costs." (*Brodie*, at p. 1329.) As part of its 2004 reform package, the Legislature amended section 4660. (Stats. 2004, ch. 34, § 32.)

Among other things, the 2004 amendment made a major change to the system used to describe the "nature" of the injured worker's "physical injury or disfigurement" (§ 4660, subd. (a)). The amendment discontinued the use of the systems described in the 1997 Schedule and previous schedules for evaluating permanent impairments and mandated the use of "the descriptions and measurements of physical impairments and the corresponding percentages of impairments published in the American Medical Association . . . Guides to the Evaluation of Permanent Impairment (5th Edition)"

45

(hereafter Guides). (§ 4660, subd. (b)(1).) The Legislature also directed the Administrative Director to amend the PD rating schedule and to adopt regulations to implement the changes made to section 4660 by Senate Bill 899. (§ 4660, subds. (b)(2), (c), (e).) In accordance with that mandate, the Administrative Director promulgated the 2005 Schedule. As Arrowood notes, the 2005 Schedule also changed the standards used to evaluate psychiatric disability. One appellate court has described the 2005 Schedule as a "formal administrative rule" implementing the requirements of section 4660. (*Fitzpatrick*, *supra*, 27 Cal.App.5th at p. 619; see also Cal. Code. Regs., tit. 8, § 9805.)

Subdivision (d) of section 4660 (hereafter 4660(d)), as amended by Senate Bill 899, provides that the 2005 Schedule "shall promote consistency, uniformity, and objectivity." It also states that the 2005 Schedule "shall apply prospectively and shall apply to and govern only those permanent disabilities that result from compensable injuries received or occurring on and after the effective date of the adoption of the schedule . . . ," which was January 1, 2005. (§ 4660(d); *Guzman*, *supra*, 187 Cal.App.4th at p. 818 [effective date].)

As for claims that were still pending when the new schedule went into effect, the final sentence in section 4660(d) provides that "[f]or compensable claims arising before January 1, 2005," the 2005 Schedule "shall apply to the determination of permanent disabilities when there has been either no comprehensive medical-legal report or no report by a treating physician indicating the existence of permanent disability, or when the employer is not required to provide the notice required by Section 4061 to the injured worker." This language has been interpreted as creating three exceptions to the prospective application of the 2005 Schedule: (1) when there has been no comprehensive medical-legal report indicating the existence of PD; (2) when there has been no report by a treating physician indicating the existence of PD; or (3) when the employer is not required to provide the notice required by section 4061. When any of the three

46

circumstances described in the final sentence of section 4660(d) have occurred before January 1, 2005, " 'the percentage of permanent disability will be calculated using the earlier schedule that was in effect on the date of the injury.' " (*Genlyte Group*, *LLC v. Workers' Comp. Appeals Bd.* (2008) 158 Cal.App.4th 705, 716 (*Genlyte*); *Chang*, *supra*, 153 Cal.App.4th at p. 753 [2005 Schedule applies to pending matters regardless of date of injury unless one of the exceptions in § 4660(d) applies].)

Arrowood does not contend that the exception for the section 4061 notice[18] applies here and the record contains no evidence on the question whether such notice was required or given in this case. Arrowood relies instead on the other exceptions in section 4660(d). It argues that the 1997 Schedule applies because Dr. Jayakar—who was the treating physician—prepared reports indicating the existence of PD *to Worker's neck and right arm* from the 2001 injury in comprehensive medical-legal reports in November 2002 and April 2004, which were written prior to January 1, 2005.

Worker does not respond to this argument. The WCJ did not address this contention directly. In his report and recommendation on reconsideration, he stated: "Since the legal definition of [permanent total disability] remained the same for both schedules, the lack of any 'old schedule' analysis [in Dr. Sidle's report] is irrelevant" and rejected Arrowood's sufficiency of the evidence argument. The WCAB adopted and incorporated the WCJ's report as its decision.

The difficulty with Arrowood's argument is that the PD award here was based solely on the injury to Worker's psyche, not her orthopedic injuries. Dr. Jayakar's 2002

---

[18] Section 4061, which pertains to the third (notice) exception for pre-January 1, 2005 claims in section 4660(d), "requires notice by the employer together with the last payment of temporary disability indemnity that (i) no permanent disability indemnity is payable, (ii) the amount that is payable or (iii) 'that permanent disability indemnity may be or is payable, but that the amount cannot be determined because the employee's medical condition is not yet permanent and stationary.' " (*Genlyte*, *supra*, 158 Cal.App.4th at p. 720.)

47

and 2004 reports did not report any injury to Worker's psyche or indicate the existence of any psychiatric PD.  In fact, there was no psychiatric injury prior to January 1, 2005.  As we have explained, the first report of any psychiatric injury was in 2006.  The first report that could possibly be construed as "indicating the existence of permanent disability" (§ 4660(d)) to the psyche was Dr. Sidle's May 2011 report, which was written more than six years after the effective date of the 2005 Schedule.  In addition, Dr. Sidle reported that Worker's psychiatric PD was due to her PTSD, which was due to her sexual exploitation by Dr. Massey in 2013.

Arrowood does not cite any cases that address the situation presented here.  Our research has disclosed one WCAB case that addressed the application of the 1997 Schedule where there have been multiple injuries, only one of which triggers the exception in section 4660(d).  The injured worker in *New United Motor Manufacturing*, *Inc*. *v*. *Workers' Comp*. *Appeals Bd*. (2007) 72 Cal.Comp.Cases 1678 (*NUMMI*) claimed cumulative injuries to his low back and hearing through November 2002.  He continued working.  He later amended his application to add cumulative injuries to both upper extremities and shoulders and alleged a new cumulative injury to the same body parts through September 2004.  In April 2004, his treating physician had found that his low back injury alone was permanent and stationary and prepared a comprehensive medical-legal report describing the PD to the low back.  The parties later agreed to use an AME.  (*Id*. at p. 1679.)  In 2006, the AME opined that there was only one cumulative trauma through the employee's last day worked in November 2004 and provided a comprehensive report describing the PD to all body parts alleged.  (*Id*. at pp. 1679, 1681.)  The WCJ found that the 1997 Schedule applied, reasoning that the treating physician's comprehensive medical-legal report in April 2004 " 'describing the factors of permanent disability to one of the body parts . . . was sufficient to trigger' " one of the exceptions in section 4660(d) " 'warranting use of the old schedule.' "  (*NUMMI*, at p. 1681.)

48

The WCJ also relied on the fact that there was but one cumulative injury claim alleging injury to multiple body parts. (*Ibid*.)

In our view, this case is distinguishable from *NUMMI*. The PD awarded here is based entirely on a compensable consequence injury that occurred after January 1, 2005. Section 4660(d) provides that the 2005 Schedule "shall apply to and govern only those permanent disabilities that result from compensable injuries received or occurring on and after the effective date of the adoption of the" 2005 Schedule. In this case, Worker's compensable consequence psychiatric injuries occurred after January 1, 2005 and the qualifying medical reports indicating the existence of the PD from those injuries were made after 2005.

The reforms in Senate Bill 899 "were enacted as urgency legislation to drastically reduce the cost of workers' compensation insurance, and the Legislature intended that the majority of the changes go into effect as soon as possible. [Citations.] The adoption of a new permanent disability rating scale was part of this scheme. The purpose of the reform package is not served by an interpretation of section 4660, subdivision (d), that delays the implementation of the new rating scale based on medical-legal reports that give no indication of permanent disability, and indeed, may have nothing to do with that subject." (*Costco Wholesale Corp. v. Workers' Comp. Appeals Bd.* (2007) 151 Cal.App.4th 148, 155.) We conclude that in the unique circumstances of this case, to require use of the 1997 Schedule based on Dr. Jayakar's reports from 2002 and 2004, which did not indicate the existence of any injury to Worker's psyche, much less the existence of any psychiatric PD, "would violate the Legislature's intent to bring as many cases as possible under the new workers' compensation law." (*Zenith Ins. Co. v. Workers' Comp. Appeals Bd.* (2007) 153 Cal.App.4th 461, 465.) For these reasons, we reject Arrowood's contention that Dr. Sidle's report was not substantial evidence because he described her

49

psychiatric PD according to the GAF scale in the 2005 Schedule and failed to describe her psychiatric PD according to the work functions in the 1997 Schedule.

### 8. The WCAB erred in awarding 100 percent PD

Arrowood argues that the WCAB erred in affirming the WCJ's award of 100 percent PD because: (1) Dr. Sidle opined that Worker's score on the GAF scale used to rate psychiatric disabilities under the 2005 Schedule was 45, which translates to a whole person impairment (WPI) of 40 percent and a PD rating of 70 percent after adjustment for diminished earning capacity, occupation, and age; (2) Dr. Sidle's testimony was insufficient to rebut the scheduled rating; and (3) Dr. Sidle was not qualified to opine that Worker could not compete in the labor market since he was not a vocational expert. We agree.

"The panoply of benefits [California's workers' compensation system] provides includes compensation for permanent disability. '[P]ermanent disability is understood as "the irreversible residual of an injury." ' [Citations.] 'A permanent disability is one ". . . which causes impairment of earning capacity, impairment of the normal use of a member, or a competitive handicap in the open labor market." ' [Citation.] Thus, permanent disability payments are intended to compensate workers for both physical loss and the loss of some or all of their future earning capacity." (*Brodie*, *supra*, 40 Cal.4th at p. 1320.)

When Worker was first injured in 2001, former section 4660 provided in relevant part: "(a) In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his age at the time of such injury, consideration being given to the *diminished ability of such injured employee to compete in an open labor market*." (Italics added.) As amended in 2004, subdivision (a) of section 4660 provides: "(a) In determining the percentages of permanent disability, account shall be taken of the

50

nature of the physical injury or disfigurement, the occupation of the injured employee, and his or her age at the time of the injury, consideration being given to *an employee's diminished future earning capacity*." (Italics added.) In *Ogilvie v. Workers' Comp. Appeals Bd.* (2011) 197 Cal.App.4th 1262, 1272 (*Ogilvie*), the court held that "the terms 'diminished future earning capacity' and 'ability to compete in an open labor market' suggest . . . no meaningful difference, and nothing in Senate Bill No. 899 suggests that the Legislature intended to alter the purpose of an award of permanent disability through this change of phrase."

The process for calculating a PD rating under section 4660 and the 2005 Schedule consists of multiple steps, which are expressed in a rating "formula" that considers each of the factors listed in section 4660, subdivision (a). (*Fitzpatrick*, *supra*, 27 Cal.App.5th at pp. 612-613.) The rating process begins by determining a standard rating for the injured worker's impairment. Generally, a psychiatric impairment is evaluated by a physician using the GAF scale, and the resultant GAF score is converted to a WPI rating using the conversion table in the 2005 Schedule. The WPI rating is expressed as a percentage, which is then adjusted for the other factors listed in section 4660, subdivision (a)—diminished future earning capacity, occupation, and age at the time of injury— according to other tables in the schedule to obtain a final PD rating. (*Fitzpatrick*, at p. 613, citing 2005 Schedule, pp. 1-2, 1-12.) The schedule is intended to " ' "promote consistency, uniformity, and objectivity" ' " in the rating process and constitutes " ' "prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule . . . ." ' " (*Fitzpatrick*, at p. 612, citing § 4660, subds. (c), (d), & *Ogilvie*, *supra*, 197 Cal.App.4th at p. 1271.)

Section 4662, subdivision (a), identifies four instances of "permanent disabilities [that] shall be conclusively presumed to be total in character," thus rating 100 percent

51

PD.  None of those instances apply here.[19]  Section 4662, subdivision (b) (hereafter 4662(b)), provides that "[i]n all other cases, permanent total disability shall be determined *in accordance with the fact*."  (Italics added.)

One practice guide has stated that the language of section 4662(b) created uncertainty regarding its relationship to section 4660, which " 'prescribes the method for determining the percentages of permanent disability' " based on the applicable schedule. (Workers' Comp. Practice, *supra*, § 5.7 (rev. 3/19), quoting *Chang*, *supra*, 153 Cal.App.4th at p. 753.)  A question arose before the WCAB whether section 4662(b) created an alternative path to establishing 100 percent PD separate and apart from the scheduled rating under section 4660 or attempting to rebut the scheduled rating under the case law.  (*Fitzpatrick*, *supra*, 27 Cal.App.5th at p. 622 [referring to this theory as an "independent path"]; *id*. at p. 610 [a "separate path"]; *id*. at p. 621, fn. 13 [the WCJ and WCAB in *Fitzpatrick* used the phrase "different paths"]; see also Workers' Comp. Practice, at § 5.7.)  Some WCAB panel decisions endorsed the alternative path approach. (See, e.g., *Anaya v. Bay Area Carbide* (2016) 81 Cal.Comp.Cases 1061, 1063 (*Anaya*) [total PD may be shown by presenting evidence of 100 percent PD "in accordance with the fact" under section 4662(b) or by rebutting a section 4660 scheduled rating].)  In 2012, a WCAB panel held in *Coca-Cola Enterprises*, *Inc*. *v*. *Workers' Comp*. *Appeals Bd*. (2012) 77 Cal.Comp.Cases 445, 447-448 (*Jaramillo*) that section 4662 applied to total PD (100 percent) and that section 4660 applied to partial PD (0 percent to 99.75 percent).

---

[19]  Section 4662, subdivision (a) provides:  "Any of the following permanent disabilities shall be conclusively presumed to be total in character:  [¶]  (1) Loss of both eyes or the sight thereof.  [¶]  (2) Loss of both hands or the use thereof.  [¶]  (3) An injury resulting in a practically total paralysis.  [¶]  (4) An injury to the brain resulting in permanent mental incapacity."

In September 2018—after the WCJ issued his second amended decision and his report and recommendation on reconsideration in this case, but before the WCAB filed its decision—the Court of Appeal in *Fitzpatrick* declined to endorse the alternative path approach, rejected the WCAB's interpretation of sections 4660 and 4662(b), and disapproved of *Jaramillo*. (*Fitzpatrick*, *supra*, 27 Cal.App.5th at pp. 620-621 & fn. 13.) The facts in *Fitzpatrick* are very similar to the facts here. The injured worker in *Fitzpatrick* claimed injuries to his heart and psyche. The psychiatrist reported that the injured worker's GAF score was 45, which translated to a 40 percent WPI and a scheduled rating of 71 percent PD after adjustment for diminished earning capacity, occupation, and age. (*Id*. at p. 614.) The psychiatrist opined that Fitzpatrick " 'was . . . "*on strict psychiatric grounds totally and permanently disabled*," ' " stated that he was " ' "dubious" ' " that he " ' "will return to work in any capacity," ' " and said that " ' "if his cardiac condition does not improve, he will not return to work." ' " (*Id*. at p. 615.) The WCJ in *Fitzpatric*k relied on the construction of section 4662(b) in *Jaramillo*, found 100 percent PD based on the psychiatrist's report alone, and impliedly held that it was not necessary for the employee to rebut the scheduled rating under section 4660. (*Fitzpatrick*, at pp. 615-616.) The WCAB panel adopted the WCJ's decision and denied reconsideration. (*Id*. at p. 615.)

The appellate court "easily harmonize[d]" sections 4660 and 4662(b) and rejected the alternative path approach. (*Fitzpatrick*, *supra*, 27 Cal.App.5th at p. 618.) It held that in "nonconclusively presumed permanent total disability cases (i.e., those cases not enumerated in § 4662, subd. (a)), permanent total disability may be found 'in accordance with the fact.' This section does not, however, address *how* such a determination shall be made; read plainly, it merely provides that a determination of permanent total disability shall be made on the facts of the case." (*Fitzpatrick*, at p. 618.) The court stated: "[s]ection 4660 addresses *how* the determination on the facts shall be made in each case

53

for injuries occurring before January 1, 2013.  Indeed, section 4660 expressly applies to the determination of 'the percentages of permanent disability' and permanent total disability is defined by statute as a percentage of permanent disability, i.e., 100 percent. (§§ 4660, subds. (a), (d), 4452.5, subd. (a).)  This definition of permanent total disability applies to the division in which section 4660 appears and was added in 1973 (predating the 2004 amendment to § 4660).  (§ 4452.5; Stats. 1973, ch. 1023, § 1, p. 2028.)  We presume the Legislature, when amending section 4660, was aware of existing related laws and intended to maintain a consistent body of statutes on the same subject matter." (*Fitzpatrick*, at pp. 618-619.)  The court noted that the 2005 Schedule also identifies permanent total disability as a percentage of disability.  In its introduction, the 2005 Schedule states that " 'A permanent disability rating can range from 0% to 100%.  Zero percent signifies no reduction of earning capacity, while 100% represents permanent total disability.  A rating between 0% and 100% represents permanent partial disability.' (2005 Schedule, p. 1-2.)  A 'final permanent disability rating' is obtained by going through the steps outlined in the 2005 Schedule.  (2005 Schedule, pp. 1-2 to 1-16.)" (*Fitzpatrick*, at p. 619.)  The schedule is intended to " ' "promote consistency, uniformity, and objectivity" ' " in the rating process and constitutes " ' "prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule . . . ." ' " (*Id.* at p. 612, citing § 4660, subds. (c), (d), & *Ogilvie*, *supra*, 197 Cal.App.4th at p. 1271.)

The *Fitzpatrick* court also observed that it is possible to obtain a 100 percent PD rating using the 2005 Schedule and that the scheduled rating under section 4660 is rebuttable.  (*Fitzpatrick*, *supra*, 27 Cal.App.5th at pp. 619-620.)  The court reasoned that the WCAB's interpretation and approach would " 'return us to the ad hoc decisionmaking that prevailed prior to 2004' " and would allow a WCJ "to make a subjective determination that may lead to inconsistent and nonuniform permanent disability ratings

54

with respect to the most expensive claims under our workers' compensation framework. Such a result cannot be squared with the Legislature's intent." (*Id*. at p. 622.) Thus, the court disapproved of the WCAB's interpretation of sections 4660 and 4662, which permitted a finding of 100 percent PD under section 4662(b) without considering the scheduled rating under section 4660 or whether the evidence rebutted the scheduled rating. The court therefore annulled the decision and remanded to the WCAB for further proceedings. (*Fitzpatrick*, at pp. 610, 615-616, 624.)

The instructions in section 1 of the 2005 Schedule describe "Rating Procedures," including the use of the Guides, calculation of a rating, and "Additional Rating Procedures," which contains a subsection entitled "Rating Psychiatric Impairment." (2005 Schedule, p. 1-1.) The subsection on rating psychiatric impairment provides: "Psychiatric impairment shall be evaluated by the physician using the Global Assessment of Function[20] (GAF) scale shown below. The resultant GAF score shall then be converted to a whole person impairment rating using the GAF conversion table below." (2005 Schedule, p. 1-12.) The 2005 Schedule contains instructions to the physician for determining a GAF score, followed by the GAF Scale, and the 2005 Schedule instructs the physician to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Do not include impairment in functioning due to physical (or environmental) limitations." (*Id*., p. 1-13.)

The GAF Scale is divided into 11 sections; each section is assigned numerical codes in a 10-point range, with a general description of the psychiatric impairments in that range and examples of how the impairment affects function. (2005 Schedule, pp. 1-14 to 1-15.) The higher the GAF score, the less severe the psychiatric impairment. (*Ibid*.) Once the physician selects the appropriate 10-point range, the 2005 Schedule

---

[20] The 2005 Schedule refers to this as both the "Global Assessment of *Function*" (2005 Schedule, p. 1-12, italics added) scale and the "Global Assessment of *Functioning*" scale (*id*., p. 1-13, italics added).

instructs the physician to "consider whether the individual is functioning at the higher or lower end of the 10 point range." (*Id*. at p. 1-13.) Dr. Sidle assigned a GAF score of 45 to Worker's disability. That means she was functioning in the middle of the "41-50" range on the GAF Scale, which the 2005 Schedule defines as: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (*Id*., p. 1-14.) As noted, the schedule instructs the person preparing the rating to convert the GAF score to a standard WPI rating using the conversion table at page 1-16 of the 2005 Schedule.

Dr. Sidle reported that he understood a GAF score of 45 to mean that Worker "cannot hold a job" and is totally disabled. As noted, Arrowood asserts, a GAF score of 45 converts to 40 percent WPI and adjusts to 70 percent PD under the 2005 Schedule in Worker's case. In our initial review of Arrowood's petition, we noted that there was no rating formula in the exhibits that confirmed the 70 percent figure. Our independent review of the 2005 Schedule suggested that the highest possible scheduled rating for a GAF score of 45 in Worker's case was 68 or 70 percent depending on the date of injury,[21] not 100 percent.

Arrowood argues that the WCAB's affirmation of the WCJ's 100 percent PD award, without considering the scheduled rating, was improper as the WCJ essentially relied on section 4662(b) and Dr. Sidle's conclusory opinion that Worker was 100 percent permanently disabled in direct contradiction of the holding in *Fitzpatrick*. When the WCJ issued his award in September 2017, the WCAB was still analyzing

---

[21] We noted that a psychiatric disability takes the highest possible future earning capacity rank (an 8), which increases the standard rating from 40 percent to 56 percent. (2005 Schedule, pp. 2-3, 2-6.) Assuming the highest possible occupational variant (a J), the PD rating adjusts to 68 percent. (*Id*., pp. 4-1, 4-4, 4-5, 5-3.) Applying her age on the date of the 2001 injury, the rating remains at 68 percent; based on her age on the date of the 2008 injury, the PD rating adjusts to 70 percent. (*Id*., p. 6-4.)

nonpresumptive 100 percent PD cases under section 4662(b) and *Jaramillo*. The WCJ did not cite section 4662(b) or *Jaramillo* in his opinion on decision or his report on reconsideration. But according to the WCAB's pretrial conference statement and Worker's answer to Arrowood's petition for reconsideration, Worker relied on section 4662(b) and *Anaya*, *supra*, 81 Cal.Comp.Cases 1061, a WCAB panel decision that applied the alternative path theory from *Jaramillo* to find 100 percent PD. Without citation to authority, Worker also argued that "[m]ultiple cases have held that a GAF of 45 [means the injured worker] 'cannot hold a job' " and that a finding of 100 percent PD is "mandated" when a QME psychiatrist finds the employee cannot work. It appears the WCJ agreed with Worker.

Given this record, we asked for supplemental briefing on the following questions: "1. What is the scheduled rating under the 2005 schedule for rating permanent disability in [Worker's] case based on her GAF score of 45? Please provide the rating formula. [¶] 2. What was the statutory basis for the award of 100% permanent disability in this case? Did Dr. Sidle or the WCAB rely on an incorrect legal theory in finding 100% permanent disability? Was the permanent disability award here authorized under [*Fitzpatrick*]? [¶] 3. Was there substantial evidence that rebutted the scheduled rating for [Worker's] psychiatric disability under the standards described in [*Fitzpatrick*]? Please describe that evidence in detail and explain why or why not, with citations to legal authority and the record . . . ." We have reviewed the supplemental briefs, as well as amicus curiae briefs filed in support of both sides.[22]

---

[22] Amici curiae for Petitioners are the California Workers' Compensation Institute and the California Chamber of Commerce. The California Applicants' Attorneys Association filed an amicus curiae brief in support of Worker and the WCAB.

In response to our first question, Petitioners contend that the scheduled rating based on a GAF score of 45, which converts to 40 percent WPI, was either 68 or 70 percent pursuant to the following rating formulas:

For the 2001 and 2005 injuries:  14.01.00 – 40 – [8] 56 – 110J – 68 – 68%

For the 2008 injury:                   14.01.00 – 40 – [8] 56 – 110J – 68 – 70%[23]

Rather than provide a rating formula (i.e., rate the PD according to the factors described in section 4660 as per the instructions in the 2005 Schedule), Worker responds that "the scheduled rating is 100%. . . .  The rating formula is simply – 100%," that a "100% rating is not modified for FEC, age or occupation," and that "[t]here is no 'rating formula' for 100%."  Worker relies on the description of permanent total disability in the introduction to the schedule, which states:  "Permanent total disability represents a level of disability at which an employee has sustained a total loss of earning capacity."  (2005 Schedule, pp. 1-2 to 1-3.)  She contends that a GAF of 45 means she has no earning

---

[23]  These rating formulas begin with the number "14.01.00," which is the "impairment number"—basically a code number—for "Psychiatric-Mental and Behavioral" impairments.  (2005 Schedule, pp. 2-1, 2-3.)  The second number (40), refers to the WPI percentage assigned to the impairment.  As noted, according to the conversion table in the schedule, a GAF score of 45 converts to 40 percent WPI.  (*Id.*, p. 1-16.)  The "[8]" refers to the "FEC rank," an adjustment for diminished future earning capacity.  A psychiatric disability takes the highest possible FEC rank, an 8.  (*Id.*, pp. 1-5 to 1-7, 2-3.)  The number "56" refers to the adjustment of the standard rating based on her FEC rank; according to the Future Earning Capacity (FEC) Adjustment Table, this increased her standard rating from 40 percent to 56 percent.  (*Id.*, p. 2-6.)  The "110J" refers to the occupational group and occupational variant.  At trial, the parties stipulated that Worker's job fit occupational group number 110, which covers numerous occupations in the "Professional, Technical, Clerical" occupation group and takes the highest possible occupational variant (a J) for psychiatric disabilities.  (*Id.*, pp. 3-15, 3-27, 3-29, 4-1, 4-4.)  According to the Occupational Adjustment Table, a 56 percent PD rating adjusts to 68 percent for occupational variant J.  (*Id.*, p. 5-3.)  The last number in the rating formula represents the adjustment for age at the time of injury.  Applying Worker's age on the dates of the 2001 and 2005 injuries (38 & 41), her 68 percent PD rating remains at 68 percent; based on her age on the date of the 2008 injury (44), her scheduled PD rating adjusts to 70 percent.  (*Id.*, p. 6-4.)

capacity since the 2005 Schedule describes GAF scores in the 41-50 range as " 'Serious symptoms . . . any serious impairment in social, <u>occupational</u>, or school functioning (e.g., no friends, <u>unable to keep a job</u>)' " and a person who cannot keep a job has no earning capacity.

We are not persuaded that the general language describing permanent total disability in the introduction to the schedule is controlling or takes precedence over the more specific, detailed instructions for rating psychiatric impairment on pages 1-12 through 1-16 of the 2005 Schedule or the mandate of section 4660, which requires consideration of the four factors listed in section 4660 to determine the percentages of PD. Worker would have us ignore the requirement that the GAF score be converted to a WPI percentage (2005 Schedule, pp. 1-12, 1-15 to 1-16), as well as the adjustments mandated by section 4660, subdivision (a) and the 2005 Schedule "to reflect diminished future earning capacity, the occupation and the age at the time of injury" (2005 Schedule, p. 1-4).

As the *Fitzpatrick* court noted, it is possible to obtain a scheduled rating of 100 percent PD. (*Fitzpatrick*, *supra*, 27 Cal.App.5th at p. 619.)[24] As for psychiatric PD, a GAF score of 29 or less converts to a WPI of 71 percent or more, which in Worker's case would result in 100 percent PD when adjusted for diminished future earning capacity, occupation, and age. (2005 Schedule, pp. 1-16, 2-7, 5-3, 6-5.) Conversely, a GAF score of 30 or more (Dr. Sidle assigned a GAF score of 45) results in a rating of less than 100 percent. For these reasons, we reject Worker's assertion that the scheduled rating based

---

[24] The *Fitzpatrick* court noted that " '[T]he final overall permanent disability rating percentage for a single impairment' is shown 'on the age adjustment table,' which contains a 100 percent disability rating. (2005 Schedule, pp. 1-9, 6-5.) For combined impairments or disabilities, the Chart also contains over 50 combined ratings of 100 percent. (2005 Schedule, pp. 8-1, 8-3 to 8-4.)" (*Fitzpatrick*, *supra*, 27 Cal.App.5th at p. 619.)

on a GAF score of 45 is 100 percent and conclude that the ratings submitted by Petitioners accurately reflect the scheduled PD rating in this case.

Worker does not respond directly to our question regarding the statutory basis for her PD award. She does not acknowledge her citation of section 4662(b) and the *Anaya* case in her briefs below. Instead, she argues that *Fitzpatrick* was wrongly decided and that it judicially repealed section 4662(b). We agree with the statutory analysis in *Fitzpatrick*, which rejected the alternative path interpretation of section 4662(b) in cases like *Jaramillo* and *Anaya*.

We also reject Worker's assertion that *Fitzpatrick* effectively repealed section 4662(b). Consistent with the plain language of section 4662(b) that nonpresumptive cases of total PD are to be decided "in accordance with the fact," *Fitzpatrick* holds that the PD is determined first in accordance with the scheduled rating and the factors enumerated in section 4660 and that the language of section 4660 makes this step mandatory. (*Fitzpatrick*, *supra*, 27 Cal.App.5th at p. 622.) Depending on the facts of the case, it is possible to obtain a scheduled rating of 100 percent PD under the 2005 Schedule. The *Fitzpatrick* court also acknowledged that the scheduled rating is rebuttable pursuant to rules developed in the case law, which gives the injured worker "the opportunity to present evidence supporting a 100 percent disability rating when the scheduled rating is less." (*Id*. at p. 620.) Thus, the injured worker may obtain a 100 percent PD award by demonstrating that based on the facts, his or her disability is greater than that reflected in the scheduled rating. Since *Fitzpatrick* acknowledged these two paths for showing total PD under section 4662(b), it did not effectively repeal that section.[25]

---

[25] In support of her contention that *Fitzpatrick* was wrongly decided, Worker asked us to review the WCJ's report and recommendation on reconsideration (not the WCAB panel decision) in *Bagobri v. A.C. Transit* (2019) 85 Cal.Comp.Cases 61. At oral (continued)

"Factual determinations of the [WCAB] must be upheld if there is substantial evidence to support them, and the relevant and considered opinion of one physician, . . . normally constitutes substantial evidence." (*Patterson v. Workers' Comp. Appeals Bd.* (1975) 53 Cal.App.3d 916, 921, citing *Place v. Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 372, 378.) But "a medical opinion is not substantial evidence if it is based on facts no longer germane, on inadequate medical histories or examinations, *on incorrect legal theories*, or on surmise, speculation, conjecture, or guess." (*E.L. Yeager Construction v. Workers' Comp. App. Bd.* (2006) 145 Cal.App.4th 922, 928, italics added, citing *Hegglin v. Workmen's Comp.App.Bd.* (1971) 4 Cal.3d 162, 169.) "A factual finding, order, decision or award is not based on substantial evidence if unreasonable, illogical, arbitrary, improbable or inequitable considering the entire record and statutory scheme." (*Genlyte*, *supra*, 158 Cal.App.4th at p. 723, fn. 18.) A medical opinion that is beyond the physician's expertise is not substantial evidence. (*Ibid*.)

Our review of the record supports the conclusion that Worker relied on the alternative path theory to support her claim of total PD. As noted, the joint pretrial conference statement indicated that she claimed total PD under section 4662(b), and she cited both section 4662(b) and *Anaya* in her answer to the petition for reconsideration. Dr. Sidle reported that her GAF score was 45, which he understood to mean "that she cannot hold a job" and would be "considered totally disabled." But a GAF score results

argument, Worker's counsel stated that the WCJ's report in *Bagobri* is the only decision that criticizes *Fitzpatrick*. The WCJ's analysis in *Bagobri* is not binding on any other WCJ, the WCAB, or this court. (*Gee v. Workers' Comp. Appeals Bd.* (2002) 96 Cal.App.4th 1418, 1424, fn. 6 [unlike the WCAB's en banc decisions, WCAB panel decisions are not binding on other WCAB panels or WCJ's].) We have reviewed the decision in *Bagobri* and do not find the WCJ's criticism of *Fitzpatrick* persuasive. In addition, there was more than sufficient medical, psychiatric, and vocational evidence in *Bagobri* that supported the WCJ's award of 100 percent PD and the conclusion that the injured worker in that case had rebutted his scheduled rating in accordance with *Fitzpatrick*.

61

in a PD rating of 68 or 70 percent under the 2005 Schedule, not total disability. Dr. Sidle's opinion is also consistent with the argument Worker makes in this proceeding based on the definition of permanent total disability in the introduction to the 2005 Schedule, a legal argument that we have rejected. For these reasons, we conclude that Dr. Sidle relied on an incorrect legal theory (the alternative path theory) when he found that Worker was totally disabled. His opinion therefore does not constitute substantial evidence that supports the WCAB's award.

The WCJ did not cite section 4662(b) or *Jaramillo* or *Anaya* in his opinion on decision or in his report on reconsideration. But the WCJ clearly agreed with Worker's view of the case. Thus, it appears the WCJ relied on the alternative path theory that was later rejected in *Fitzpatrick* to award 100 percent PD. *Fitzpatrick* was final in February 2019. By the time the WCAB issued its decision here in June 2019, the *Fitzpatrick* court had disapproved of Jaramillo. . But nothing in the WCAB's decision indicates that it considered the scheduled rating or *Fitzpatrick* or whether Worker had presented substantial evidence to rebut the scheduled rating when it reviewed this matter.

Worker's reliance on *Qualcomm, Inc. v. Workers' Comp. Appeals Bd.* (2019) 84 Cal.Comp.Cases 531 (*Qualcomm*) is misplaced. In that case, the WCAB adopted the reasoning of the WCJ, who found that the injured worker had rebutted the scheduled rating in accordance with *LeBoeuf, supra*, 34 Cal.3d 234. (*Qualcomm*, at pp. 533-534.) The WCJ in *Qualcomm* did not rely on section 4662(b) as an alternative path to award total PD.[26]

---

[26] Worker relies in part on the unpublished writ denial opinion of the appellate court in *Qualcomm*. Court of Appeal opinions that are not published in the Official Reports, even though available in print in the California Compensation Cases, may not be cited or relied upon in any court. (Cal. Rules of Court, rule 8.1115.) On the other hand, WCAB panel decisions and denials of petitions for writ of review reported in the California Compensation Cases, along with WCAB denials of petitions for (continued)

In our request for supplemental briefing we also asked the parties whether there was substantial evidence that rebutted the scheduled ratings in this case. Petitioners contends that Worker failed to introduce substantial evidence that rebutted the scheduled ratings. Petitioners argue that rebutting the scheduled rating required vocational evidence, that Dr. Sidle was not a vocational expert, that it is improper for a doctor to opine that the employee is unable to compete on the open labor market, and that there was no vocational evidence here. They contend that while Dr. Sidle opined that Worker could not work eight hours a day, five days a week, he failed to consider a wide range of available jobs, part-time work, or at-home work. Moreover, they contend that under *LeBoeuf*, Worker was required to show that she was not amenable to vocational rehabilitation. Worker responds that she was not required to rebut the scheduled rating because the scheduled rating was 100 percent.

Section 4660, subdivision (c) provides that "without formal introduction in evidence," the 2005 Schedule "shall be prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule." As this court observed in *Guzman*, " 'A statute providing that a fact or group of facts is prima facie evidence of another fact establishes a rebuttable presumption.' (Evid. Code, § 602.) Accordingly, as 'prima facie evidence' the Schedule is not 'absolute, binding and final. [Citations.] It is therefore not to be considered all of the evidence on the degree or percentage of disability. Being prima facie it establishes only presumptive evidence [which] may be controverted and overcome.' " (*Guzman*, *supra*, 187 Cal.App.4th at p. 826; brackets in *Guzman*.) Thus, the schedule "may be rebutted based on the specific

reconsideration reported in other sources, are properly citable authority, but only to the extent that they point out the contemporaneous interpretation and application of the workers compensation laws by the WCAB. (*Smith v. Workers' Comp. Appeals Bd.* (2000) 79 Cal.App.4th 530, 537, fn. 2.) "Although we encourage citation of these cases, we emphasize that they are of limited precedential value and unquestionably have no stare decisis effect in an appellate court." (*Ibid.*)

circumstances of a case." (*Fitzpatrick*, *supra*, 27 Cal.App.5th at p. 614, citing *Ogilvie*, *supra*, 197 Cal.App.4th at pp. 1266-1276.)

Worker argues that the award here was due to a failure of proof by Petitioners. We disagree. The rebuttable presumption established by section 4660, subdivision (c) is a presumption affecting the burden of proof, and the burden of rebutting a scheduled rating rests with the party disputing the rating. (*Almaraz v. Environmental Recovery Services* (2009) 74 Cal.Comp.Cases 1084, 1097-1098 [WCAB en banc], citing Evid. Code, §§ 601, 605.) Since Worker disputed the scheduled ratings of 68 and 70 percent, she had the burden of presenting substantial evidence that rebutted those ratings.

After the Legislature amended section 4660 in 2004, several cases discussed methods for rebutting a scheduled rating. (See, e.g., *Guzman*, *supra*, 187 Cal.App.4th at pp. 826-829 [rebuttal of impairment standard/WPI rating]; *Ogilvie*, *supra*, 197 Cal.App.4th at pp. 1273-1277 [rebutting FEC component of rating]; *Contra Costa County v. Workers' Comp. Appeals Bd.* (2015) 240 Cal.App.4th 746, 751 (*Dahl*) [rebuttal based on alternative calculation of FEC component of rating].) There are three ways to rebut the FEC component of a scheduled rating. First, the schedule may be rebutted when a party can show a factual error in the application of a formula or the preparation of the schedule. Second, when amending section 4660, the Legislature left intact cases, including *LeBoeuf*, *supra*, 34 Cal.3d 234, which hold that a scheduled rating has been effectively rebutted when the injury impairs the employee's rehabilitation, and for that reason, the employee's diminished future earning capacity is greater than reflected in the scheduled rating. Third, the scheduled rating may be rebutted when the employee can demonstrate that the nature or severity of the injury was not captured within the sampling of disabled workers that was used to compute the adjustment factor. (*Fitzpatrick*, *supra*, 27 Cal.App.5th at p. 620, citing *Dahl*, *supra*, at p. 751; see also *Ogilvie*, at pp. 1273-1277.) The method that arguably applies here is the second method.

64

The employee in *LeBoeuf* was working as a bus driver when he was attacked and beaten by four youths. He sustained multiple contusions and abrasions, and developed an anxiety neurosis. A WCJ found that his psychiatric injury caused 60 percent PD and awarded benefits based on that rating. (*LeBoeu*f, *supra*, 34 Cal.3d at pp. 237-238.) The Rehabilitation Bureau of the WCAB later determined, based on evidence from vocational rehabilitation experts, that LeBoeuf would not be able to return to suitable gainful employment through vocational rehabilitation services. (*Id*. at pp. 239-240.) The injured worker petitioned to reopen his case, arguing that he was entitled to an award of 100 percent PD since it was not feasible for him to participate in vocational rehabilitation. The WCAB denied the petition to reopen. (*Id*. at p. 240.) Our Supreme Court observed that the provision of rehabilitation benefits will have a significant impact on an injured worker's ability to compete and held that "the fact that an injured employee is precluded from the option of receiving rehabilitation benefits should also be taken into account" in assessing the injured worker's PD rating. (*Id*. at p. 243.) The court concluded that the finding that LeBoeuf was not qualified for vocational rehabilitation benefits was good cause to reopen. (*Id*. at p. 246 & fn. 12.)

"The first step in any *LeBoeuf* analysis is to determine whether a work-related injury precludes the claimant from taking advantage of vocational rehabilitation and participating in the labor force. This necessarily requires an individualized approach." (*Dahl*, *supra*, 240 Cal.App.4th at p. 758.) A scheduled rating is not rebutted by evidence that the injured worker cannot be returned to his or her pre-injury earning capacity. (*Id*. at p. 759.) In *Dahl*, both parties presented evidence from vocational experts on the injured worker's ability to take advantage of retraining opportunities or to find a new job. (*Id*. at pp. 758-759.)

Dr. Sidle reported that in 2016, Worker was even more anxious and depressed than before, and since her symptoms were worse, he reduced her GAF score from 51 to

45, which he understood to mean "that she cannot hold a job" and is totally disabled. He opined "that she is clearly not able to work at this time." He reported that she had "various deficits in self-esteem and self-confidence; also loss of interest in usual activities." The factors that impacted her ability to work included "her anxiety and depression; her difficulty with sleep; her decreased energy; her decreased concentration," "the fact that she physically cannot do many of the things that she normally did," "fatigue from not sleeping as fully as possible and from her chronic stress." He opined that it was not possible for her "to meet the demands of an employer on a steady basis eight hours a day, five days a week." In deposition, he agreed that she was 100 percent "disabled from working in the open labor market."

The WCAB has held that the role of the medical evaluator in workers' compensation cases is to assess work restrictions and resulting permanent impairment. (*Blackledge v. Bank of America* (2010) 75 Cal.Comp.Cases 613, 619-621 [WCAB en banc].) In *LeBoeuf*, the evidence regarding the injured worker's employability included conflicting opinions from two psychiatrists and conflicting opinions from two vocational experts. (*LeBoeuf*, *supra*, 34 Cal.3d at pp. 237, 238.) In *Merino v. Workers' Comp. Appeals Bd.* (2001) 66 Cal.Comp.Cases 405, 406 (writ denied), the WCAB held that while it is proper for a doctor to give an opinion on whether an injured worker can perform his or her usual and customary duties, opinions about " 'competing in the open labor market' " are beyond the doctor's expertise, and must be left to a vocational rehabilitation specialist. In *Morris v. Workers' Comp. Appeals Bd.* (2014) 79 Cal.Comp.Cases 1348, 1350 (writ denied), the WCJ found that the record did not support a finding of 100 percent PD because the injured worker failed to produce sufficient evidence to rebut the scheduled rating. The WCJ stated that to effectively rebut a scheduled rating pursuant to *LeBoeuf* and *Ogilvie*, "an injured worker must present vocational expert evidence, in addition to medical evidence, proving that his or her

66

diminished future earning capacity is greater than that reflected in the schedule" and found that "[i]t is improper for a doctor to deem an applicant 100% permanently disabled based on the doctor's opinion that the applicant is unable to compete on the open labor market." (*Ibid*.) A majority of the WCAB panel denied reconsideration and adopted the WCJ's reasoning as its decision. One commissioner "disagreed with the WCJ's suggestion that a physician's determination that an injured worker is not able to compete in the open labor market is inadequate rebuttal evidence." (*Id*. at p. 1353.)

Based on this authority, we agree that Worker did not meet her burden of rebutting the FEC component of the scheduled rating in accordance with *LeBoeuf*. Dr. Sidle did not opine on Worker's ability to participate in vocational rehabilitation, take advantage of training opportunities, or find work. While Dr. Sidle was able to opine on these matters from a medical or psychiatric standpoint, he was not a vocational expert, he was not qualified to opine on these points from a vocational perspective or opine that she was 100 percent "disabled from working in the open labor market." As Petitioners note, while Dr. Sidle stated that it was not possible for her "to meet the demands of an employer on a steady basis eight hours a day, five days a week," Dr. Sidle did not consider part-time work, work at home, other alternative work settings, retraining options, or her ability to participate in vocational rehabilitation.

Another way to rebut the scheduled rating is to challenge the impairment standard used in the scheduled rating (40 percent WPI in this case). (*Guzman*, *supra*, 187 Cal.App.4th at pp. 826-829.) Although the WCAB panel decision in *Golden Gate Bridge*, *Highway & Transportation Dist*. *v*. *Workers' Comp*. *Appeals Bd*. (2018) 83 Cal.Comp.Cases 1704 (writ denied) involves rebuttal evidence in cases rated under the Guides, not the GAF scale, it provides some guidance for evaluating the rebuttal of an impairment standard under the 2005 Schedule. The WCAB explained that to properly rebut a PD rating, "a physician is expected to: (1) provide a strict rating per the AMA

*Guides*; (2) explain why the strict rating does not accurately reflect the employee's disability; (3) provide an alternative rating within the four corners of the AMA *Guides*; and (4) explain why the alternative rating most accurately reflects the employee's level of disability." (*Id*. at p. 1706; see also *Guzman*, at pp. 828-829.) Dr. Sidle provided a strict rating under the schedule's GAF scale by assigning a score of 45, which converts to 40 percent WPI. But he erroneously assumed that a GAF of 45 meant she was 100 percent disabled. Dr. Sidle described various factors that affect Worker's ability to work, but did not explain why the 40 percent WPI score did not accurately reflect her disability, provide an alternative rating within the GAF scale, or explain why that rating more accurately reflected the level of her disability. He did not cite any extrinsic resources (i.e., standard texts or recent research data) that supported deviating from the WPI assigned by the schedule. (*Guzman*, *supra*, 187 Cal.App.4th at p. 829.) For these reasons, we conclude that Worker did not meet her burden of rebutting the scheduled rating.

Since Dr. Sidle, the WCJ, and the WCAB all relied on an incorrect legal theory, the alternative path theory, to find 100 percent PD and Worker's evidence did not rebut the scheduled rating of 68 or 70 percent, we conclude that the award of 100 percent PD is not supported by substantial evidence. We shall therefore annul the WCAB's decision and return these cases to the WCAB for further proceedings consistent with the opinions stated herein.

### 9. Apportionment should be considered on remand

Arrowood argues that Dr. Sidle's opinions are not substantial evidence because he failed: (1) to apportion between the three industrial injuries and opined instead that the three injuries were inextricably intertwined; (2) to apportion to nonindustrial factors (stressors in her history); and (3) to apportion to the pain disorder and depression that predated her 2013 PTSD diagnosis. Since we annul the WCAB's decision and remand

68

for further proceedings, these issues are moot. We provide the following observations on the issue of apportionment for the parties' and the WCAB's guidance on remand.

After the legislative reforms in 2004, "the new approach to apportionment is to look at the current disability and parcel out its causative sources—nonindustrial, prior industrial, current industrial—and decide the amount directly caused by the current industrial source." (*Brodie*, *supra*, 40 Cal.4th at p. 1328.) This requires evaluating physicians, the WCJ, and the WCAB to " ' "make an apportionment determination by finding what approximate percentage" ' " of the PD was a direct result of each industrial injury and what approximate percentage of the PD " ' "was caused by other factors both before and subsequent to the industrial injury, including prior industrial injuries." ' " (*Acme Steel v. Workers' Comp. Appeals Bd.* (2013) 218 Cal.App.4th 1137, 1143.)

In *Benson*, *supra*, 170 Cal.App.4th at page 1560, the Court of Appeal recognized that "there may be limited circumstances, . . . when the evaluating physician cannot parcel out, with reasonable medical probability, the approximate percentages to which each distinct industrial injury causally contributed to the employee's overall permanent disability." In such limited circumstances, the physicians' apportionment determination "could properly be that the approximate percentages of disability caused by each of the successive injuries cannot reasonably be determined. As a result, the employee would be entitled to an undivided (i.e., joint and several) award for the combined permanent disability, because the respective defendants would have failed in their burdens of proof on the issue of apportionment." (*Id.* at p. 1541, fn. 3.) The question is whether this case presents one of those "limited circumstances."

Workers' compensation law also recognizes that the need for medical care may result from the combined effects of more than one injury. In such cases, a joint and several award of medical treatment in favor of the employee is permitted, subject to later apportionment between the responsible employers or carriers. (§ 3208.2; *Zenith*

69

*Insurance Co. v. Workers' Comp. Appeals Bd.* (1981) 124 Cal.App.3d 176, 189.)  The employer or its insurer has the burden of proof on apportionment because it is the employer who benefits from apportionment.  (*Benson*, *supra*, 170 Cal.App.4th at p. 1541, fn. 3; *Kopping v. Workers' Comp. Appeals Bd.* (2006) 142 Cal.App.4th 1099, 1115.)

> **10.  Arrowood's contentions that the WCAB ordered total PD at the wrong weekly rate for the 2001 injury and that it erred in directing Arrowood to administer the award have been waived**

The WCAB awarded total PD starting on October 7, 2010, at $916.33 per week, subject to statutory cost of living adjustments (§ 4659, subd. (c)).  Arrowood argues that the WCAB awarded total PD at the wrong weekly rate for the 2001 injury and that the correct rate was $490 per week.  We conclude this issue is not cognizable in this writ proceeding, since Arrowood failed to raise it in either of its petitions for reconsideration to the WCAB.  (§ 5904 ["all objections, irregularities, and illegalities" not raised in the petition for reconsideration are deemed to have been "finally waived"]; *Bussa v. Workers' Comp. Appeals Board* (1968) 259 Cal.App.2d 261 [points not raised in petition for reconsideration are deemed finally waived and cannot be considered on review by appellate court]; *Guerra v. Workers' Comp. Appeals Bd.* (2016) 246 Cal.App.4th 1301, 1305, fn. 3.)

Arrowood argues that since the WCAB ordered total PD at the 2008 rate, XL Specialty "should be the administering party," since XL Specialty was the carrier for the 2008 injury.  The WCAB's selection of a certain carrier to administer an award is a matter of discretion.  The court may disturb the WCAB's selection only where a clear abuse of discretion has been shown as when the rationale behind the WCAB's selection is clearly erroneous.  (*General Ins. Co. of Am. v. Workers' Comp. Appeals Bd.* (1980) 104 Cal.App.3d 278, 286-287 [WCAB abused its discretion in selecting carrier who had only 16 days coverage over carriers with years of coverage when choice was based on erroneous legal reasoning].)  We conclude that this point cannot be considered on review

70

in this writ proceeding because Arrowood failed to raise it before the WCAB. (§ 5904.) Moreover, Arrowood has not cited any legal authority that supports this point, has not explained how the WCAB abused its discretion in selecting it to administer the award, or otherwise demonstrated that the choice was clearly erroneous.

Accordingly, we conclude that the issues of the weekly rate for permanent total disability for the 2001 injury and the choice of defendant to administer the award are waived in the writ proceedings before us.

## V. CONCLUSIONS

The following is a summary of our conclusions and holdings in these cases:

(1) We reject XL Specialty's contention that the correct date of injury for the cumulative trauma was in March 2002.

(2) On the issue of industrial causation, we conclude that Worker met her burden of proving that her PTSD was a compensable consequence injury that resulted from the treatment for her industrial injuries and that her employment was one of the contributing causes without which the PTSD would not have occurred. We reject Petitioners' contention that the sexual conduct here was consensual, since as a matter of law a patient cannot consent to sexual contact with his or her physician (Bus. & Prof. Code, § 729, subd. (b)), as well as their contention that the PTSD is not compensable under the rules governing industrial injuries arising out of assaults by third parties.

(3) We reject XL Specialty's assertion that it is not liable for Worker's psychiatric disability since it did not authorize or pay for any of the treatment with Dr. Massey or his clinic. Substantial evidence supports the conclusion that Dr. Massey treated Worker for injuries sustained during XL Specialty's coverage period.

(4) We reject XL Specialty's challenges to the sufficiency of Dr. Feinberg's AME reports to support the WCAB's finding of orthopedic injuries during XL Specialty's coverage period.

71

(5) We conclude that substantial evidence supported the WCAB's finding that Worker's PTSD was due in part to her 2001 injury since Dr. Massey treated Worker for all three injuries and Arrowood authorized and paid for the treatment with Dr. Massey.

(6) We hold that there was substantial evidence of a new need for medical treatment, including psychiatric treatment, before November 2006 that supported the WCAB's finding of new and further disability from the November 2001 injury.

(7) We reject Arrowood's contention that Dr. Sidle's report was not substantial evidence because he evaluated Worker's PD under the wrong rating schedule and hold that in the circumstances in this case, the 2005 Schedule applies to Worker's psychiatric PD claims.

(8) We conclude that the 100 percent PD award must be annulled because: (a) the psychiatric reports that the WCAB relied on do not constitute substantial evidence since Dr. Sidle relied on an incorrect legal theory, the alternative path theory, that was rejected in *Fitzpatrick*, *supra*, 27 Cal.App.5th 607; and (b) Worker's evidence was otherwise insufficient to rebut the scheduled rating for her psychiatric disability.

(9) Since we are remanding this case for further proceedings on PD, we conclude that Arrowood's assertions regarding apportionment are moot. We nonetheless provide some authority on the law of apportionment for guidance on remand.

(10) We conclude that Arrowood's contentions that the WCAB ordered total PD benefits at the wrong weekly rate for the 2001 injury and that the WCAB erred in ordering it to administer the joint and several PD award are not cognizable in these proceedings.[27]

---

[27] Since we annul the award and remand the matter for further proceedings before the WCAB, we conclude that Arrowood's request for a stay pending review is moot.

## VI. DISPOSITION

The WCAB's decision after reconsideration is annulled and the matter is remanded to the WCAB for further proceedings consistent with our opinion. Each party shall bear its or her own costs in these proceedings. (Cal. Rules of Court, rule 8.493(a)(1)(B).)

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
DANNER, J.

*Applied Materials v. WCAB*
**H047148**

*XL Specialty Ins. Co. v. WCAB*
**H047154**

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| APPLIED MATERIALS et al.,<br><br>    Petitioners,<br><br>    v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and D.C.,<br><br>    Respondents. | H047148<br>(W.C.A.B. No. ADJ1351389)<br><br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |
| XL SPECIALTY INSURANCE CO.,<br><br>    Petitioner,<br><br>    v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and D.C.,<br><br>    Respondents. | H047154<br>(W.C.A.B. Nos. ADJ7168611,<br>           ADJ7183596) |

THE COURT:

The opinion in the above-entitled matter filed on May 7, 2021, was not certified for publication in the Official Reports. The California Lawyers Association Workers' Compensation Section, California Workers' Compensation Institute, and California Chamber of Commerce request that the opinion be certified for publication. Under California Rules of Court, rule 8.1105(c), the opinion is ordered published.

1

BAMATTRE-MANOUKIAN, J.

ELIA, ACTING P.J.

DANNER, J.

*Applied Materials v. WCAB*
**H047148**
*XL Specialty Ins. Co. v. WCAB*
**H047154**

2

| | |
|---|---|
| Original Proceeding: | Workers' Compensation Appeal Board<br>W.C.A.B. Nos. ADJ1351389, ADJ7168611,<br>ADJ7183596 |
| Workers' Compensation Appeals Board<br>Administrative Law Judge: | Hon. David L. Lauerman |
| Attorney for Petitioners:<br>Applied Materials<br>Arrowood Indemnity Company | Nicholas Eddie Tse<br>Michael Sullivan & Associates |
| Attorney for Petitioner and Respondent:<br>XL Specialty Insurance Co. | Barbara Joyce Toy<br>Testan Law |
| Attorney for Respondent:<br>Workers' Compensation Appeals Board | Allison Jane Fairchild<br>WCAB Office of the Commissioners |
| Attorneys for Respondent:<br>D.C. | Arthur L. Johnson<br>Thomas J. Butts<br>Butts & Johnson |
| Attorney for California Applicants' Attorney<br>Association as Amicus Curiae on behalf of<br>Respondents WCAB and D.C. | Bernhard Beltaxe<br>Eric Maxwell Overholt<br>Smith & Baltaxe, LLP |
| Attorney for<br>California Workers' Compensation Institute<br>and California Chamber of Commerce as<br>Amicus Curiae on behalf of Petitioners | Ellen Sims Langille<br>California Workers' Compensation Institute |